**United States District Court**
**Northern District of Georgia**

**TWT**

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 0 4 2014

JAMES N. HATTEN, Clerk
By _____ Deputy Clerk

|  |  |
|---|---|
| Marcia Harris | ) |
| Plaintiff | ) |
|  | ) |
|  | ) |
| v. | ) |
|  | ) |
| Orange Business Services, | ) |
| U.S. Inc., | ) |
| Orange S.A., | ) |
| Almerys S.A.S, | ) |
| Dr. Patrice Cristofini, | ) |
| Dr. Yves Miaux, | ) |
| Barbara Ngouyombo, | ) |
| Hammond Bale Solicitors | ) |
| L.L.P., Griffin and King Ltd, | ) |
| Landwell & Associés/ | ) |
| Partners | ) |
| Defendants | ) |
|  | ) |

1:14 - CV - 0641

## COMPLAINT

## NATURE OF THE ACTION

This is an action for damages for violations of the Racketeer Influenced and

Corrupt Organizations Act, (18 U.S.C. §§ 1961 et seq.), the Georgia RICO

(Racketeer Influenced and Corrupt Organizations) Act (O.C.G.A.§16-14-2 (2010)),

the Georgia Trade Secrets Act of 1990 (O.C.G.A. §§ 10-1-760 through 10-1-767

(2011)), and common law fraud.

Marcia Harris ("Harris") seeks injunctive relief and damages to remedy defendants' fraudulent and/or willful and malicious and/or grossly negligent conduct related to the operation of a sophisticated conspiracy designed to fraudulently acquire the intellectual property, trade secrets and other assets developed by Anoigma Ltd. ("Anoigma") and consequently destroy Harris's property rights in them.

Harris alleges violations of the Georgia Trade Secrets Act against Orange Business Services U.S., Inc. ("OBS") aided and abetted by all the other Defendants (Claim I). Harris alleges violations of the Racketeer Influenced And Corrupt Organizations Act ("RICO") against OBS, Orange S.A. ("Orange"), Almerys S.A.S. ("Almerys"), Dr. Patrice Cristofini ("Cristofini"), Dr. Yves Miaux ("Miaux"), Barbara Ngouyombo ("Ngouyombo"), Hammond Bale Solicitors L.L.P. ("HB"), Griffin and King Ltd ("G & K") and Landwell & Associés/ Partners ("Landwell") (Claim II). Harris alleges violations of the Georgia RICO Act against OBS, Orange, Almerys, Cristofini, Ngouyombo, and Miaux, aided and abetted by HB, G & K and Landwell (Claim III). Harris brings claims in common law fraud against OBS and Orange (Claim IV).

## THE PARTIES

1.     Plaintiff Harris is a U.S. citizen and a Chicago, Illinois resident who held approximately 19% of the shares of Anoigma Ltd ("Anoigma"), an English high tech health care sector company dissolved on March 29, 2012.  She was both a director of Anoigma and an employee of Anoigma in the capacity of Chief Finance Officer ("CFO".)

2.     Defendant OBS, formerly Equant, Inc. doing business as Orange Business Services, is "a Delaware corporation with its principal place of business in Atlanta, Georgia." (See Exhibit 1 at 10.)[1]

3.     Defendant Orange, formerly France Telecom S.A. ("France Telecom" or "FT"), is "a corporation organized and existing pursuant to the laws of France with its headquarters and principal place of business" in Paris, France. *Id.*

4.     Defendant Almerys is a corporation organized and existing pursuant to the laws of France with its headquarters and principal place of business in Clermont-Ferrand, France. It is a direct subsidiary of Orange which holds the majority ownership interest in it.  It provides healthcare-related technology services to companies.

5.     Defendant Cristofini was a 3% shareholder of Anoigma, and a 10% shareholder of its successor company Cloud Santé S.A.S. ("CS"), a French

---

[1] A list of all exhibits is provided at the end of this document at page 86.

company dissolved on January 16, 2012. As of March 2012, Cristofini is Sales Director, Vertical Healthcare, Huawei Western Europe, Huawei SRL, 92 Boulogne Billancourt, Paris, France. Huawei SRL is a subsidiary of Huawei Technologies Co. Ltd., a multinational networking and telecommunications equipment and services company headquartered in Shenzhen, Guangdong, China. From November 2007 to March 2012, Cristofini was Vice President of Strategic Partnerships, Healthcare, for Orange in Paris, France.

6. Defendant Miaux is Advisory Medical Director at Synarc Inc. in San Francisco, California where he oversees the Radiology Services Group. He was a 5% shareholder of Anoigma, and a 23% shareholder of CS.

7. Defendant Ngouyombo is currently studying in a Masters degree program at the University of Lyon, France, a program she began in September 2013. Until March 2013, she was the General Manager (Directrice générale) of Fourmisanté.com, a French health information website owned by Amarpi S.A.S. of Lyon, France. Previously, she was the majority shareholder of Anoigma and of CS. She was the Chief Executive Officer ("CEO"), and a director of Anoigma and subsequently the President-General Manager (Président-Directrice générale) of CS.

8. Defendant HB is a partnership organized under the laws of England and Wales, with its principal place of business in London, England. It is a law firm.

9.    Defendant G & K is a company organized under the laws of England and Wales with its principal place of business in Walsall, West Midlands, UK. It provides liquidation and insolvency services to companies.

10.    Defendant Landwell is a partnership organized under the laws of France with its principal place of business in Marseilles, France. It is part of Landwell Global, a law firm associated with PriceWaterhouseCoopers PC.

11.    The actions alleged herein to have been undertaken by OBS, Orange, Almerys, Cristofini, Miaux, Ngouyombo, HB, G & K and Landwell (collectively, "Defendants" and each a "Defendant") were undertaken by each Defendant individually; were actions that each Defendant caused to occur; were actions that each Defendant authorized, controlled, directed, or had the ability to authorize, control or direct; and/or were actions in which each Defendant assisted, participated or otherwise encouraged; and are actions for which each Defendant is liable. Each Defendant aided and abetted the actions of the Defendants as set forth below, in that each such Defendant had knowledge of those actions, providing assistance to, and/or benefiting from, those actions, in whole or in part.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and

1332, in that at least one cause of action arises under the laws of the United States,

there is diversity of citizenship among the parties, and the amount in controversy

exceeds $75,000. The Court has jurisdiction over the state law claims under 28

U.S.C. § 1367(a) in that said claims are joined with substantial and related claims

under the laws of the United States, and form "part of the same case or

controversy" as those claims.

13. This Court has personal jurisdiction over the Defendants because they

purposefully availed themselves of the privilege of conducting activities in this

forum or purposefully directed their activities towards this forum. Harris's claims

arise from the Defendants' forum-related activities.

14. Venue in this District is proper under 28 U.S.C. § 1391(b) since it is a

judicial district in which "any defendant may be found, if there is no district in

which the action may otherwise be brought." Venue in this District is proper under

18 U.S.C. § 1965 1/16/96 since "(a) any civil action or proceeding under this chap-

ter against any person may be instituted in the district court of the United States for

any district in which such person resides, is found, has an agent, or transacts his

affairs and (b) in any action under 18 U.S.C. § 1964 for civil remedies in any

district court of the United States in which it is shown that the ends of justice

require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof."

## BACKGROUND INFORMATION

Legal Background Information

15. On January 18, 2011, Harris filed suit against some of the Defendants (specifically, Orange (at that time France Telecom), Cristofini, Miaux, Ngouyombo, and HB), in the Northern District of Illinois. That previous suit was dismissed on August 22, 2011 on the basis of *forum non conveniens*.

16. The present suit includes parties not included in the previous suit (in particular OBS, as well as others) and also claims not included in the previous suit, in part based on new evidence not available at the time of the previous lawsuit. Plaintiff alleges that Defendants' actions within that previous lawsuit were themselves part of the conspiracy at the heart of this complaint, and were designed to divert attention away from the central role of OBS, a U.S. company, in that conspiracy (leaving the Plaintiff and the Court with the misimpression that the conspiracy was foreign-led) and providing Defendants with additional time to further the conspiracy for the benefit of OBS. The Plaintiff alleges that OBS is the one leading the development and implementation of that conspiracy, not only in

the actions injuring Harris, but also in the subsequent defrauding of others in a similar way, and in reaching out to other potential victims.

Factual Background Information

17. On February 17, 2009, the American Recovery and Reinvestment Act of 2009 ((Pub. L. 111-5) ("ARRA") was signed into law by the federal government. One portion of the ARRA is called the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act".) The HITECH Act provides financial incentives for meaningful increased use of Electronic Health Records ("EHR".) The HITECH Act operates in tandem with the Health Insurance Portability and Accountability Act (Pub.L. 104-191, 110 Stat. 1936, enacted August 21, 1996 )("HIPAA") which also incentivizes the adoption of EHR. The combination of the HITECH Act and HIPAA motivates healthcare providers (and consequently insurers as well) to increase meaningful use of EHR by providing both "carrots" (financial incentives for EHR adoption under the HITECH Act) and "sticks" (civil and potentially criminal penalties for violations and non-compliance under HIPAA, not receiving financial incentives for EHR adoption and future full reimbursement under the HITECH Act). No other Western country (such as France or the U.K.) has focused such attention on developing EHR and on making these EHR broadly accessible. Moreover, the growth potential for this market is large,

and justifies OBS's interest in it. PricewaterhouseCoopers  issued a report in or about 2012 estimating the future worth of the mobile health (e.g., cell phone-based e-health) market at 23 billion US dollars by 2017.[2]

18.      Harris alleges that OBS's e-health division was, and continues to be, highly motivated to find and sell products to meet clients' needs to comply with the provisions of the HITECH Act and HIPAA, and indeed, to meet clients' EHR needs even before the passage of these acts.  As early as 2007, OBS announced its collaboration with Igeacare Systems, Inc. for services rollout related to " automated electronic record of care and track patient outcomes, making it possible for insurers/payers to implement Pay-for-Performance payment systems and integration of patient data into an Electronic Health Record." (Exhibit 2.) This evidence is at variance with the statements of Robert O'Brien, Vice President of Strategy and Solutions at OBS ("O'Brien") in his June 3, 2011 Declaration made under penalty of perjury on behalf of Orange (see Exhibit 3.) First, O'Brien repeatedly uses the term "medical device industry" (Id. at 3 and at 4) rather than the boarder term of e-health, which would make OBS's interest in EHR more

---

[2] See Online article posted November 21, 2012, *Why there is such a Frenzy about Medical Apps?* http://medicalappjournal.com/medicalblog/2012/11/21/why-there-is-such-a-frenzy-about-medical-apps/#.UtwthLTnaCr, originally published as invited commentary in the 12th Edition of iBusiness Magazine, focused on "Business Apps & Healthcare Solutions".

obvious. Second, OBrien claims that e-health is of relatively minor importance to

OBS and that its collaboration with Orange is minimal:

> Plaintiff refers to the "Orange-Healthcare" Division of FTSA
> [now Orange] and claims that his division "operates through OBS
> globally,"...This is incorrect. A few employees of Equant [now OBS]
> dedicate a portion of their time on an ad-hoc basis to delivering
> Equant [OBS] integrated solutions to companies in the medical device
> industry. (Id. at 3.)

O'Brien's own Declaration contradicts his statement that employees devote only a

portion of their time on an ad-hoc basis to this sector when he refers to "Mr.

Helkov, Equant's [OBS's] VP of e-health in the United States" (Id. at 4.)  See

below at paragraphs 25 and 56 for a discussion of the importance of Helkov and

his 50-person team in the U.S., and see also paragraphs 144 to 145 below for a

discussion of the implications of O'Brien's alleged fraudulent concealment for

Harris's fraud claim in this suit.

19.    Further, despite O'Brien's minimization of this relationship,[3] OBS and

Orange do business collaboratively in the health care sector under the name

Orange Business Services[4]  They are accessible through a single on-line website,

---

[3] Id. at 4.

[4] According to a press release issued by what was then France Telecom in or about
2008, "Orange Business Services is the new name for OBS and the business
operations of France Telecom and Orange in the global market. The Orange
Business Services banner represents OBS's expertise in international IP networks,
Orange's existing mobile solutions and France Telecom's leadership in business

www.orange-business.com, have a very broad range of interests and expertise in

the health care sector (see Exhibit 5) and are looking to expand further (see Exhibit

6.) A recent market research study, published in November 2013, recognized

Orange Business Services as one of the top two leaders in the field of e-health,

citing as the primary evidence for this leadership position its successful

collaboration with the Sorin Group.[5] This collaboration was initiated by OBS and

operates in the U.S. and Europe. (See below at paragraphs 55 to 56.)

20.     That this collaboration is still the primary example of leadership in this field

also evidences the fact that this is a field that operates on a very long time

framework since this collaboration, negotiated by OBS, was not formalized until

2009 and not implemented until 2012. Interestingly, Cristofini in an email to

Harris and Ngouyombo in November 2009 made this same point about the sector

(See Exhibit 7), and Plaintiff alleges that the Defendants are able to use this long

time frame in order to effectively implement the conspiracy involved in this case.

---

communications services." More recent press releases echo the same information
and speak of the global integration of the services. Interestingly, while O'Brien
referred to his employer only as Equant, Inc., William Johnson, Vice President for
Sourcing at OBS referred to his employer as "Equant Inc. d/b/a Orange Business
Services," even while he was trying to distance OBS from Orange. (See Exhibit 4.)
Harris alleges that this is yet a small example of O'Brien's pattern of fraudulent
concealment.

[5] Study by Reportbuyer.com:
http://www.redorbit.com/news/science/1113001439/embracing-m2m-
opportunities-in-healthcare-the-case-of-orange-business/

21. While many software providers and in-house staff are developing the software to provide domestic EHR, few, if any, have given their attention to the need for mobile EHR for U.S. citizens, both for those away from home within the U.S. (for example, college students and vacationers) and also for those working in or travelling to other countries. These people, served by various insurance companies providing specialized insurance, represent a specialized need, particularly for mobile medical records that can be accessed in the language of both the patient and the health care delivery service. These individuals frequently need access to health care records in a number of languages. With their international capacities and interconnections (see footnote 4 above), as well as their focus on e-health, delivery of this service would be very much in the interests of OBS and Orange.

22. The Plaintiff (Harris) was an early stage investor in Anoigma, an English high-tech health sector start-up company focused on solving the problem of portable EHR. Harris was involved from on or about December 2008 through March 2012 as a shareholder of Anoigma (see Exhibit 8 at 2 and Exhibit 9[6]), and

---

[6] Exhibit 9 contains two documents. One evidences the date on which Harris acquired the shares. It is a document filled out at the time of Harris's acquisition of the shares. Ngouyombo had mistakenly filled out the form for shares not acquired by cash purchase. She then filled out the correct form which she submitted to Companies House, and Harris retained a copy of the incorrect form prepared at the

from on or about December 2008 through January 2010 as a director and employee (Chief Financial Officer, or "CFO") of Anoigma. (See Exhibit 8 at 2, 3, 12 and 13 and Exhibit 10.) Harris understands the relevance of EHR issues in part because her three children are doctors trained at, and/or practicing at, major medical facilities in the U.S. who all have knowledge of, and interest in, the issues involved in EHR. Harris is a lawyer, but she has not practiced law for a number of years, during which time she has been involved in corporate finance and other support for new and developing enterprises.[7] Harris understands the corporate structures of Orange and OBS because, in or about the late 1990's, she represented the then-parent company of OBS, and prepared their filings for the Securities and Exchange Commission and also, around the same time, represented the lead investment bank in the initial public offering and subsequent debt

---

same time. The second document is a letter from Martin Bale evidencing that Harris paid cash for her shares.

[7] Plaintiff holds a J.D. and practiced as a transaction lawyer, never as a litigator, representing large corporations or investment banks in corporate finance transactions. As a currently non-practicing lawyer, Plaintiff does not have access to Lexis or Westlaw, and has had to conduct all case research using publicly available tools such as justia, leagel and similar sites. Therefore, she is not able to provide page number cites, except in Supreme Court cases. Since the Defendants and the Court do have access to these tools, she is omitting the URL references for her access of these cases, with the understanding that the Defendants and the Court can easily find the exact location of the relevant quote.

offerings of a communications company that was owned by a previous owner of the Orange brand.[8]

23.     Anoigma developed unique mobile e-health intellectual property in the form of a specialized software system (and related computer codes) for the storage, transport and retrieval of personal EHR (including medical images and a database of medications with equivalents in a large number of countries) as well as a unique user interface system and the capacity to enable individuals to carry their medical records on an interactive "smart" device (such as a "smart" USB stick, card or cell phone) that could be synchronized with on-line data, and that could be translated into various languages as needed (the "IP".) [9] This same intellectual property can also enable institutions to share medical records across the U.S. or between countries for individual or groups of patients. This IP, along with its embodiment on a "smart" USB stick to demonstrate Anoigma's products (the "Prototype"),

---

[8] With all their acquisitions and expansion, the sweep of activities of Orange and OBS reach widely across the U.S. When Harris explored the possibility of engaging a major U.S. law firm to represent her, it was difficult to find one of the required sophistication since all of those she approached had a conflict of interest through their representation of OBS and/or Orange.

[9] The later addition to the IP contracted for preparation by Jackson Bramwell Ltd ("JB") in approximately September 2009 (see Exhibit 11, Chronological List of Predicate Acts, at Item 4) is subsumed under the term IP, since it is part of the IP held by Anoigma prior to the alleged conversion of the IP on or about late December 2009 to early January 2010.

were jointly valued at approximately 800,000 euros (or approximately $1.4 million) in November 2009. (See Exhibit 12 at 2.)

24.     On or about May 20, 2009, Harris and Ngouyombo (together representing Anoigma) met with Cristofini (representing Orange) at the offices of Orange in Paris. There, Harris and Ngouyombo demonstrated Anoigma's Prototype. Shortly after meeting, Orange (then FT) provided a Non-Disclosure Agreement (Exhibit 13) and a letter of intent evidencing interest in the IP and in development of the concept (Exhibit 14) to Anoigma.

25.     It stands to reason that a description of Anoigma's concept and Prototype was then communicated to OBS sometime in May or June 2009, since Orange and OBS are closely allied collaborators in the delivery of health-related services as outlined in paragraph 19 above. Harris alleges that Orange would be likely to pass this information along to OBS since the latter serves as the "brains" in a "RICO enterprise" with Orange, and since the Anoigma IP was so immediately relevant for the U.S. Specifically:

- O'Brien acknowledged that he and Niels Helkov ("Helkov"), the lead members of the OBS e-health team (located in Atlanta), "coordinate" at least "some of [their] work with certain employees of FTSA [Orange] in France" (Exhibit 3 at 4);

- Cristofini was at that time Vice President of Strategic Partnerships, Healthcare, for Orange in Paris (see Exhibit 15 at 1), and was one of a relatively small number of Orange Business Services team members. He was thus presumably one of the Orange e-health employees with whom the Atlanta-based OBS team members coordinated;

- Thierry Zylberberg ("Zylberberg"), the Vice President for e-health at Orange took credit for the major e-health contract that Helkov negotiated (see Exhibits 16 and 17), indicating the close relationship between OBS and Orange in e-health (see also paragraph 56 below for a more detailed discussion of their relationship and Harris's allegations that OBS serves as the "brains" in their "RICO enterprise"); and

- the Anoigma IP was (and remains) highly relevant to the U.S. market and to OBS and Orange (see paragraphs 17 to 19 and 21 above.) E-health is so important to OBS that Helkov supervises a team of 50 staff (see Exhibit 17.)

26.    Harris and the various Defendants were all well aware of the economic potential for Anoigma's products in the U.S.  Consequently, Harris directed significant efforts to develop that potential. From January 2009 through November

2009, Harris, on behalf of Anoigma, held face-to-face, telephone and on-line meetings with various persons in the U.S., or from the U.S. as well as with persons in the U.K. and France regarding marketing to multi-national companies who would use Anoigma's products within the U.S. or for U.S. citizens working or traveling abroad (as indicated in paragraph 21 above.)   These persons included potential investors, representatives of potential investors, potential clients, and suppliers (such as Pepid LLC, the Chicago-based supplier of the multi-country medications data base)[10].

27.    Moreover, during Anoigma's bankruptcy proceedings, Harris (having moved back to the U.S. at the beginning of September 2009[11]) began negotiations to purchase Anoigma's IP and other assets in order to set up a company in the U.S. to sell products based on the IP in the U.S.  (See Exhibit 19.)   It was only through Harris's due diligence in connection with this asset purchase and planned U.S. company development that the details of the Defendants' initial alleged misappropriation of these assets as alleged here began to emerge, in or about June

---

[10]It is worth noting that potential investors recognized the value of the IP, and were prepared to invest in Anoigma even before it earned any revenue. (See, for example, Exhibit 18.)

[11]Harris's move back to the U.S. on September 3, 2009, and the implications of that move for the alleged fraudulent conversion of the IP by the Defendants are discussed in greater detail below in paragraphs 30, 33, 35, 40 to 41 and 46 to 50, and in Exhibit 11 at Items 16 through 20.

2010 (see Exhibit 11 at Item 28.) Some of the details related to this initial alleged

misappropriation did not emerge until August through November 2010 (see below

at paragraph 28 and at footnote 26 to paragraph 49 and Exhibit 11 at Items 24 and

30 and at footnotes 2 to 6.)

28.     The Plaintiff alleges that Defendants Cristofini, Ngouyombo and Miaux --

three of the four shareholders (in addition to Harris), two of them also officers (in

addition to Harris) of Anoigma -- had secretly and fraudulently converted the IP to

another company, CS, that they secretly created in opposition to the interests of

Anoigma at the same time that Anoigma still existed and while these Defendants

still held those positions of fiduciary responsibility within it.   Harris alleges that as

late as November 2010, Defendants were still making fraudulent statements in

court documents regarding the date of the establishment of CS and its relationship

to Anoigma  (see, for example, Exhibit 20 at ET-3), even in the face of

considerable evidence of the truth (see Exhibit 21.)  Further, despite Defendants'

various claims that there was no relationship between Anoigma and CS and that

the Anoigma IP was valueless (See Exhibit 19 at 9 and 10), on or about August 6,

2010, CS gained an award based on the IP (although this information was not

publicly available until the CS website went online on or about November 10,

2010 (See Exhibit 20.)  It also became apparent that the Defendants had continued

to focus on the U.S. potential of the IP. (See, for example, Exhibit 23,

Ngouyombo's Note published in November 2010, in which she not only outlined

the economic potential for EHR-related products in the U.S. (Id. at 4 (translation

provided)) but also described the IP as belonging to CS and highlighted a

partnership among CS and Orange Business Services-Almerys for

commercializing products based on the IP (Id. at 7 (translation provided.))

29.    Plaintiff alleges that OBS, having learned of the existence of the Anoigma IP

and Prototype in late May of 2009, encouraged its co-conspirator Orange to have

Cristofini act quickly to express interest in Anoigma and its products in order to

keep close watch on the IP (hence the NDA signed by Zylberberg on behalf of

Orange, in or about late May 2009[12] and the letter of interest signed by Cristofini

on behalf of Orange in June 2009[13]), and to further this process by having

Cristofini become involved in Anoigma as a shareholder and officer.

30.    In early September 2009, Cristofini acquired shares and a director position

within Anoigma (see Exhibits 24[14] and 25[15] and paragraph 35 below.) Plaintiff

---

[12] See Exhibit 13.  On information and belief, this agreement was signed by
Zylberberg in late May 2009.
[13] See Exhibit 14.
[14] This exhibit was previously introduced into evidence by Orange (then FT) in
*Harris v. France Telecom et al.*
[15] This exhibit was previously introduced into evidence by Orange (then FT) in
*Harris v. France Telecom et al.*

alleges that OBS and its collaborators accelerated their conspiracy to illegitimately acquire the IP as soon as Harris returned to live in the U.S., a move that reduced Harris's ability to scrutinize directly the acts of the Defendants in connection with Anoigma (see paragraphs 35, 39 to 40 and 45 to 49 below.) Harris alleges that the Defendants, aided and abetted by HB and G & K, moved to fraudulently remove her from her position as Director and to put Anoigma into bankruptcy.[16] (See Exhibit 11 at Items 13 to 15, 23 to 24.)

31.     It is important to note that although Defendants tried to pressure Harris to resign and sell her shares in Anoigma (see Exhibit 11 at Item 14) using threats of bankruptcy, Harris refused to do so. To the contrary, Harris took it upon herself at this time to further alert the other shareholders and directors to what she alleged was a financial cover-up. Indeed, it was Harris's similar earlier actions (see Exhibit 11 at Items 7 to 9 and 11) that provided the basis for the English court's judgment in Harris's favor for unfair termination, and their award of punitive damages to her,[17] for having been terminated from her employee status because of whistle blowing (See Exhibit 8 at 4 - 5, paragraph 13 and at 8, paragraph 5.)

---

[16] Anoigma was not officially dissolved until March 29, 2012.

[17] Whistleblowing is one of the relatively few bases for granting of punitive damages under English law, and the fact that Harris was granted such damages indicates how seriously the English court took the Defendants' actions.

32.    In or about March or April 2010, through Harris's negotiations with G & K

(see, for example, Exhibit 19 and Exhibit 11 at Item 23), several Defendants

became aware of Harris's interest in purchasing Anoigma's IP and other assets for

the purpose of setting up a company to sell products like the Prototype in the U.S.

In June 2010, Almerys became directly aware of this interest by Plaintiff because

of her emails to them (see Exhibit 26 and Exhibit 11 at Item 26.) As discussed

below in paragraphs 41 to 42, Harris alleges that Almerys acquired access to the IP

in the context of its plans for development of a product combining the IP with its

security systems. In February 2013, Orange Business Services (the collaboration

between OBS and Orange) announced Almerys's development of such a product

(see Exhibit 27.) It is worth noting that the press release's first contact for more

information is a U.S. one, demonstrating the Defendants' awareness of the strong

relevance of this product for the U.S. market.

33.    For a while, Defendants took no action with regard to Harris's plans to

acquire the IP for a U.S. company, possibly because they thought that Harris would

either not find out about their fraudulently concealed acts or would not take any

action with regard to them. However, when it became clear that Harris had learned

of some of the Defendants' fraudulently concealed acts, as alleged in this case, and

had launched lawsuits to protect her rights (first in England to protect her rights as

an employee and then in the U.S. to protect her rights as a shareholder[18]), Plaintiff

alleges that OBS and its co-conspirators once again took actions to reduce scrutiny,

as they had done previously in secretly setting up a company competitive to

Anoigma. Harris alleges that their actions involved cover-up activities in relation

to those lawsuits, including false statements and/or fraudulent omission in both

suits. (See above at paragraph 28 and below at paragraphs 141 to 144.) Harris

alleges that on the same date that Defendants Cristofini and Ngouyombo were

served in *Harris v. France Telecom et al*, they put CS, Anoigma's successor

company, into bankruptcy without (on information and belief) acknowledging the

existence and value of the IP as an asset in that bankruptcy (the same deception

that they had previously perpetuated in the Anoigma bankruptcy.) Harris alleges

that, in consequence, they surreptitiously left the IP in the hands of Almerys, one

of OBS's co-conspirators, without anyone having to pay for that acquisition. The

Plaintiff alleges that Defendants OBS and Orange are continuing to hold the IP in

Almerys and/or have moved the IP into a non-visible unit of Orange, for the

benefit of OBS (see below at paragraphs 52 to 54.)

34.    The IP, however, legitimately belonged to Anoigma, a company of which

Harris held approximately 19% of the shares, and she alleges that all the transfers

---

[18] i.e., *Harris v. Anoigma and CS* in England and *Harris v. France Telecom et al* in the U.S.

of the IP to other companies were fraudulent. She further alleges that the

Defendants deprived Harris of the value of her shares and prevented her not only

from receiving the money judgment awarded to her by the English court but also

from purchasing the IP for commercialization in the U.S. and reaping the

consequent profits, and that the Defendants have unjustly enriched themselves

through the implementation of their conspiracy.

35.    The Plaintiff alleges that the conspiracy was facilitated by the fact that on

September 3, 2009[19] Harris returned to live in the U.S. where she has lived

continuously since that date. On September 5, 2009 (two days after Harris's arrival

in the U.S.), a service agreement ("SA") was reached with Cristofini by which he

received approximately 3% of shares in Anoigma in exchange for providing

advisory services as a non-executive director (see Exhibits 24 and 25.)[20]

36.    Despite his claims to the contrary (see Exhibits 15 and 28), it is highly

unlikely that Cristofini was acting without the knowledge of Orange in acquiring

---

[19] In August 2009, in preparation for her return to residence in the United States, Harris shipped most of her furniture and a large amount of her personal chattels to the United States, where they continue to remain in her residence there.

[20] It is worth noting that one of Cristofini's two emails regarding the service agreement was sent from his Orange (then FT) email account on August 17, 2009 (see Exhibit 25) and was signed with his Orange (then FT) job title and work contact details. The fact that Orange (then FT) used this email as an exhibit in *Harris v. France Telecom et al* suggests that Orange found nothing amiss in Cristofini's putting himself forward in this way as their agent while negotiating his acquisition of shares in Anoigma.

these shares since he would have been taking an unreasonable risk of being exposed for acts indicating conflict of interest and conflict with the terms of his employment contract.[21] Cristofini had been the one to sign the letter of intent regarding Anoigma on behalf of Orange (see Exhibit 14), and, on information and belief, his job responsibilities at that time included assessing potential corporate acquisitions for Orange in the area of healthcare. (See Exhibit 29.) Indeed, on or about July 22, 2009 (about six weeks prior to his agreement to the SA which included his acquisition of shares in Anoigma), Cristofini explicitly stated that he would seek investment by Orange and OBS (i.e., his corporate "group") into Anoigma (see Exhibit 30 with translation) in an email sent from his Orange email account and signed with his job title and work contact details. His own investment in Anoigma would therefore have been in direct conflict with Orange, unless Orange had agreed to Cristofini's investment.

37.     Resolution of such potential conflict of interest between Cristofini and Orange was in fact explicitly affirmed by Cristofini since he agreed to a term in the SA under the heading "Conflict of Interest" that he had received all necessary approval to enter into the SA. (Exhibit 24 at 4.) In his email indicating acceptance of the SA, Cristofini requested modification of certain terms, but this clause was

---

[21] The exact terms of his employment contract are a matter for discovery.

not one for which he requested any change. (See Exhibit 25.) In his Declaration to

a U.S. court on behalf of Orange (see Exhibit 28), he attempted to rebut this

explicit agreement by reference to his statement in his email that his consulting to

Anoigma would be done by him during days off he amassed in compensation for

having logged work hours in excess of his contracted 35-hour work week at

Orange (see Exhibit 25 at 4 and Exhibit 28 at 3, paragraph 5.) However, this

statement in Exhibit 28 is irrelevant since it does not address the conflict of interest

arising from becoming one of only four shareholders and a director in a company

that was in active negotiations with his employer. Moreover, Cristofini was

certainly aware of such negotiations since he himself was the one engaging in them

on behalf of his employer. He had signed the letter of intent with Anoigma (see

Exhibit 14) and his position at Orange as vice president of strategic partnerships

for healthcare (see Exhibit 29) indicates his responsibility for directing such

negotiations. Harris alleges that Cristofini's statement, made under penalty of

perjury, was in fact fraudulent concealment and part of a concerted attempt on the

part of OBS and Orange to mislead the Court and the Plaintiff about the role of

OBS and Orange in the conspiracy.

38.     It is difficult to give credence to Cristofini's statements in his first

Declaration that he was acting without the knowledge of Orange (see Exhibit 15.)

Cristofini indicated in this Declaration, made under penalty of perjury, that he did

not have the approval of Orange to acquire shares and a directorship position in

Anoigma, since he claims that he had not told Orange about the SA, despite his

agreement to the term in the SA that he had received such approval. In Cristofini's

second Declaration (see Exhibit 28), also made under penalty of perjury, he argued

that the could work for two separate companies that were in active negotiations

with one another without being guilty of a conflict of interest because he worked

for the two companies during separate hours or days. Such a statement is patently

absurd. Harris alleges that Cristofini's statements in his second Declaration are a

disengenuous attempt to deflect attention from the real conflict of interest that

would have existed if he had not been acting as an agent for OBS and Orange in

their attempt to infiltrate Anoigma and fraudulently acquire its IP. The fact that

this statement was made on behalf of Orange is germane, Harris alleges, to the

efforts by Orange and OBS to mislead the Court about their role in the conspiracy.

Cristofini's acquisition of an ownership interest in Anoigma took place during the

same time period that Orange (Cristofini's employer) had expressed interest in

collaboration with Anoigma (see Exhibit 14) and during the same time period that

Cristofini had stated that he would seek investment in Anoigma from Orange and

OBS ["his group"] (see Exhibit 30.) If, as Cristofini claims, he had not gained

explicit approval from Orange, he would have been enmeshed in a web of conflict of interest far more serious than whether he consulted to Anoigma during his hours of employment at Orange. Moreover, Orange did not explicitly disassociate itself from Cristofini's actions, either in a statement in *Harris v. France Telecom et al* or by having Cristofini resign from his position after they purportedly became aware of Cristofini's actions as a result of that lawsuit. In fact, Cristofini continued in his position for over a year (see Exhibit 29.) Therefore, Harris alleges that Orange was indeed well aware of Cristofini's relationship with Anoigma, at least as far back as the date he signed the SA (September 5, 2009), if not earlier, and that in fact OBS and its co-conspirators were using Cristofini as their agent so that the ownership interest and decision-making influence Cristofini gained through the SA enabled him to facilitate the fraudulent acquisition of the IP by OBS.

39.    Even in the final stages of reaching agreement on the SA, Cristofini began exerting such influence by recommending that Anoigma develop a working relationship with Almerys, a company that Harris alleges is one of OBS's co-conspirators. On September 2, 2009, Harris and Ngouyombo met with executives of Almerys, a closely managed subsidiary of Orange in its healthcare division and a company with which Cristofini had a close working relationship. That meeting with Almerys took place the day before Harris moved back to the U.S.

40.    Harris alleges that once she moved back to the U.S., Cristofini could exercise more influence for the benefit of OBS and its co-conspirators both on Anoigma and its CEO, Ngouyombo, without Harris's scrutiny. Ngouyombo was young and inexperienced, and, Plaintiff alleges, Ngouyombo was vulnerable to suggestions of malfeasance (such as withholding financial information from the Plaintiff and from potential investors)[22]. The Plaintiff alleges that, as soon as she had moved back to the U.S., Cristofini stepped up his part in the conspiracy to fraudulently acquire Anoigma's IP for OBS's use by beginning the process of fraudulently removing Harris from her roles within Anoigma, and by involving Anoigma further and further with OBS's co-conspirators Orange and Almerys.

41.    Harris alleges that Almerys induced Anoigma to disclose its IP on the pretext of developing a joint product offering. The idea of the joint product offering was to integrate the computer coding contained within the Anoigma IP with Almerys's security system for "smart" devices, which had just been published as a U.S. patent application on September 17, 2009[23], although this information about the patent status was not, on information and belief, revealed to Anoigma. Such integration would make the Anoigma IP even more appealing to U.S. clients.

---

[22] See Exhibit 11 at Items 4, 5 and 16

[23] See http://appft1.uspto.gov/netacgi/nph-arser?Sect1=PTO1&Sect2=HITOFF&d=
PG01&p=1&u=%2Fnetahtml%2FPTO%2Fsrchnum.html&r=1&f=G&l=50&s1=%
2220090235080%22.PGNR.&OS=DN/20090235080&RS=DN/20090235080

Indeed, in keeping with the understanding of the long time frame for product development in this area, Orange Business Services announced the development of just such a product by Almerys in February 2013 (see Exhibit 27).

42. The discussions between Anoigma and Almerys were ostensibly focused towards the needs of Almerys client Mobility St. Honoré, an insurance company serving expatriates from France, Canada and the U.S., thus well aware of the demands of HIPAA and the opportunities under the HITECH Act. However, on information and belief, Almerys never did present a joint product to any client as part of a product developed jointly either with Anoigma or with Anoigma's successor, CS. Harris alleges that such a joint presentation was never made because the collaboration was merely a pretext for gaining access to the IP; and that OBS did not want Anoigma or CS to gain visibility with clients OBS might want to approach later once it had fraudulently acquired the Anoigma IP. Again, it is significant that Orange Business Services announced such a product developed by Almerys in February 2013, only after both Anoigma and CS had been dissolved, and, Harris alleges, the IP had been left in the hands of Almerys and/or one of OBS's other co-conspirators.

43. In or about early September 2009, Ngouyombo entered a financially binding contract for an amount greater than the amount of money available to Anoigma,

putting it into "insolvency" under English law. Harris alleges that with the encouragement of Cristofini, Ngouyombo concealed this contract from Harris, even though Harris was the CFO. (See Exhibit 11 at Item 4 for details and a fuller discussion of the various implications of this breach of fiduciary trust.) To the best of Harris's knowledge and belief, this was the first time that Ngouyombo had concealed anything from her since Harris had became a shareholder and director about ten months previously, and the Plaintiff alleges that it indicates the rapid acceleration of the OBS-directed plan to disengage and defraud Harris while fraudulently acquiring the IP.

44.    The Plaintiff alleges that Cristofini encouraged Ngouyombo to take steps that led to a loss of financial credibility for Anoigma by encouraging the withholding of financial information from investors even more than from Harris (see Exhibit 7 as well Exhibit 11 at Item 7 for a fuller discussion). Harris's presence on the Anoigma board added financial credibility to third party investors (see, for example, Exhibit 31, in which a potential investor highlights Harris's background to another potential investor.) Steps that negatively affected Anoigma's financial credibility and reduced Anoigma's probability of obtaining independent third party investment included alienating Harris, failing to file public accounts and closing Harris's Anoigma email account at a time various investors

were engaged in due diligence research as part of their potential investment in

Anoigma (See Exhibit 11 at Items 10, 11 and 16 for details.) Harris protested

against all of these steps as they were taken, and indeed these protests were among

the whistleblowing acts in which Harris engaged. Harris alleges that part of

Cristofini's role in the conspiracy was to decrease Anoigma's potential autonomy

and access to third-party investment capital so that the IP could more easily be

fraudulently transferred to OBS through its co-conspirators.

45.    Cristofini capitalized on his alienating Ngouyombo from Harris, the Plaintiff

alleges, by manipulating Ngouyombo further into even more serious steps of fraud

as part of the larger plan to convert the IP for the benefit of OBS with the

collaboration of Orange and Almerys.  These included:

- setting up a company competitive to Anoigma, with all the same

   shareholders except Harris, before beginning the Anoigma bankruptcy

   process[24]  (See Exhibit 11 at Items 17 and 18 for details);

---

[24] Defendants Cristofini, Miaux and Ngouyombo deposited money in Bank
National Paribas on behalf of CS  and completed various documents for the
purpose of furthering the formation of CS through the agency of Bank National
Paribas as evidenced by documents signed and stamped by a bank official at the
Bank National Paribas in Brest, France on December 21, 2009 (see Exhibit 21.)
Using considerable diligence, Harris tracked down these documents and gained
access to them (via a French website from which a non-European user could not
obtain information) in August 2010, at which time Harris had been back resident in
the U.S. for nearly a year. At that time, having gained access to this information,

- removing Harris as a shareholder of Anoigma in a process fraught with fraud (See Exhibit 11 at Items 13 to 15, 21 for details);

- forcing Anoigma into a bankruptcy that was fraudulent for many reasons, including not recognizing the existence or the value of the IP; (See Exhibit 11 at Items 23 to 26 for details); and

- illegally paying certain of Anoigma's debts (such as the contract with JB and fees to Landwell) through the fraudulently established successor company in violation of the bankruptcy proceedings for Anoigma.[25] (See Exhibit 22 and Exhibit 11 at Items 19 to 20 for details.)

46.   Harris alleges both that the conspirators' agent Cristofini selected the law firm of HB, because they knew HB would knowingly engage in acts that contravened English law in order to aid and abet these Defendants, and that HB then implemented the fraudulent removal of Harris as a director of Anoigma. This

she modified her complaint to the English court in what had been to that point *Harris v. Anoigma*.

[25]There is no publicly available information as to whether the preference (preferred) share holders of Anoigma were illegally reimbursed for their investment in Anoigma at the time of its liquidation, and/or whether they were given similar status within CS and were illegally paid off at the time of its liquidation. Since these shareholders were friends and family of Ngouyombo, it is likely that such payments were made by Defendants, and this is a matter to be examined through discovery.

process began on November 27, 2009 and concluded with Harris's removal as a Director on January 5, 2010, on which date Harris was in Chicago. (See Exhibit 11 at Items 13 to 15, 21 for details).

47.     Harris alleges that one of HB's acts in aiding and abetting Defendants OBS, Orange and Cristofini was its recommendation of G & K, a liquidator located in a provincial city distant from London that was unfamiliar with international transactions and would participate in the fraudulent dissolution of Anoigma without recognizing the value of the IP and pursuing its monetization for the benefit of creditors, even after details of the IP valuation and G & K's decision-making powers over Anoigma's wholly owned subsidiary were revealed to G & K by Harris.  (See Exhibit 19 and Exhibit 11 at Items 26 and 27 for details.)

48.     Harris alleges both that OBS's agent Cristofini, used the "muscle" of Orange (one of the most powerful corporations in France) to convince Landwell to act in violation of its fiduciary duty to Anoigma and that Landwell did so by facilitating the setting up of CS to be competitive to Anoigma and by facilitating the fraudulent transfer of Anoigma assets to CS (such as the lease of premises in Meyreuil, France).  (See Exhibit 11 at Items 20 and 26 for details.)

49.     Harris alleges that OBS and its co-conspirators planned well in advance for the several stages by which the illegitimate acquisition of the IP took place,

through a sequence of taking of intellectual property, including but not limited to,

the IP. The Plaintiff alleges that the surreptitious taking of the name "Cloud Santé"

by Orange Business Services demonstrates how OBS and its co-conspirator

Orange perpetrated conversion of intellectual property against CS and its

shareholders as they had against Anoigma and its shareholder Harris. Harris

alleges that OBS and Orange:

- manipulated Ngouyombo and Miaux, via OBS's and Orange's agent

  Cristofini (a shareholder of Anoigma and later also of CS as were

  Ngouyombo and Miaux), to select the name "Cloud Santé" in late 2009[26]

  for the company they set up secretly in competition to Anoigma while

  Anoigma was still an operating company;[27] and

_____

[26] On or about November 26, 2009, Ngouyombo reserved the name of "Cloud Santé" for a website (cloud-santé.com) (See Exhibit 33.) However, Harris did not find this information out by her due diligence until March 2010 (see Exhibit 19.) The website www.cloud-santé.com did not actually appear on the internet until on or about November 10, 2010.

[27] On or about December 21, 2009, Cristofini, Miaux and Ngouyombo signed documents evidencing the establishment of a new company, CS, in competition to Anoigma (see Exhibit 21.) However, Harris did not gain access to this information until August 2010, after considerable due diligence, because it was only available on a French website sometime after February 19, 2010 from which data could not be retrieved by a non-European user, and Harris had by then been back as a resident in the U.S. for nearly a year. Moreover, it was not until on or about mid-June 2010 (in the process of due diligence related to purchase of the IP) that Harris became aware that CS was operating as a successor to Anoigma and began to look for more information about it. She was not able to access these documents until on

- secretly took the name "Cloud Santé" sometime in 2011[28] (certainly before
  CS was dissolved and quite possibly while CS was still an operating
  company) for a sub-division of Orange Business Service's healthcare
  division while Cristofini was simultaneously an executive in that division
  and a shareholder of CS.[29]

50.    Harris's monetary judgment in her employment claim against CS in *Harris v.*
*Anoigma and CS* was finalized on December 23, 2010 and mailed to the parties on
January 4, 2011 (See Exhibit 8 at 8), and at the request of CS, a written explanation
of the judgment was provided on February 18, 2011 and mailed to the parties on
February 21, 2011 (See Exhibit 8 at 6.) Harris served Orange at an office of OBS
on or about January 18, 2011 in *Harris v. France Telecom et al*. Thus, Cristofini,
Orange and OBS were well aware of Harris's suit before March 17, 2011 and these

or about August 2010, at which time she filed copies of them with the English
court and modified her complaint in what was, at that time, *Harris v. Anoigma*.
[28]The date that this subdivision was set up is a matter for discovery. Currently, it
can only be estimated from the online resume of Frederic Attia ("Attia") since he
does not give an exact date for his taking up the position of director of the Cloud
Santé subdivision (as he does for his other position within Orange). He gives only
the year 2011, so the length of time that he is listed as holding the position varies
with the date on which the information is downloaded (see Exhibit 33 at 3 and at
6). This sub-division is still not visible on the Orange website.
[29]It is a matter of discovery to determine whether Orange paid CS a license for the
use of its name; however, Harris alleges that no payment was made since CS
declared bankruptcy for lack of funds only a month or so later. Indeed, Harris
alleges that the shareholders of CS, other than Cristofini, were not informed of this
fraudulent taking of intellectual property by Orange and OBS.

Defendants as well as Ngouyombo were well aware of Harris's monetary judgment against CS (which was referred to in *Harris v. France Telecom et al.*) However, Ngouyombo, the nominal head of CS, moved for liquidation of that company on March 17, 2011, the same day that Defendants Cristofini and Ngouyombo were served with the complaint in *Harris v. France Telecom et al*. Plaintiff alleges that OBS and Orange used the impending prospect of scrutiny under that lawsuit to pressure Ngouyombo to dissolve CS as soon as she and Cristofini were served in order to conduct a further fraudulent transfer of the IP, and make such transfer more difficult to uncover.

51.     Harris further alleges that Defendants OBS and Orange, via their agent Cristofini, perpetrated similar acts of fraud against Ngouyombo and Miaux as those they had previously perpetrated against Harris by putting CS into liquidation without any recognition of, or attempt to monetize, the IP. (See Exhibit 37 and paragraph 49 above.) Moreover, Harris alleges that at no time did OBS, Orange or Almerys attempt to legally acquire CS as a company rather than fraudulently, and surreptitiously, acquiring the IP. One of the other results of this liquidation for purported insolvency was that it enabled the Defendants to justify avoiding paying Plaintiff approximately $465,000 (£295,107), as per the judgment against CS (see Exhibit 8 at pages 7 to 8.) Harris had obtained this judgment from a U.K. court to

cover compensation for Harris's unpaid salary and damages due to her as result of termination of employment because of whistleblowing. (See Exhibit 8 at pages 4 to 5, paragraph 13; page 7, paragraph 2; and page 8, paragraph 5).

52.    As a result of the liquidation of CS, Harris alleges that the IP was illegally transferred to Almerys which had gained access to the IP through the partnership first with Anoigma and then with CS.  Harris alleges that Almerys knowingly participated in the illegitimate transfer of the IP from Anoigma to CS, since it was put on notice by Harris through emails sent in June 2010 (see Exhibit 26) pointing out that CS had not paid for the Anoigma IP and that working with CS would violate Almerys's NDA with Anoigma that was signed, on information and belief, in or about October 2009 (See Exhibit 35.)  Given that, on information and belief, Almerys continued working with CS after these emails from Harris, the Plaintiff alleges that Almerys also knowingly participated in an illegitimate transfer of the IP from CS to itself at the behest of OBS and Orange.

53.    Harris alleges that after *Harris v. France Telecom et al* was dismissed for *forum non conveniens*,  OBS and Orange may have moved the IP out of Almerys and "parked" it inside Orange in a non-visible unit within Orange called Cloud Santé (i.e., the same name as the successor company to Anoigma) for the benefit of OBS. Harris alleges that Almerys may also have kept access to the IP, given the

new product announced by Orange Business Services in February 2013 that bears a striking similarity to the product proposed to be created in collaboration between Almerys and Anoigma (see Exhibit 27.)

54.    Harris alleges that OBS may be delaying the more explicit commercialization of the Anoigma IP for one or more of the following reasons:

- outlasting the statute of limitations for Harris's litigation and the attendant scrutiny; and/or

- enabling them to use the relative invisibility of "parking" the asset within Orange until they are ready to face competitors and/or until they choose to market a product similar to the Anoigma IP; and/or

- providing the long lead time for rollout required in this sector.

55.    The long lead time in this sector is illustrated by a different project and product in which OBS has worked with Orange: the collaboration with the Sorin Group related to in-home monitoring of cardiac patients in the U.S. and selected countries in Western Europe. Although Orange (as FT) announced the signing of an agreement with the Sorin Group for joint development of these services on March 18, 2009 (See Exhibit 16), launch of these services was not announced until June 13, 2012 (See Exhibit 36).

56.    This contract with Sorin also illustrates that OBS may serve as the "brains"

of the collaboration with Orange without receiving public recognition for its role.

Helkov of OBS negotiated the contract with Sorin for both OBS and Orange, and

Helkov has identified this contract with Sorin as the "[l]argest international e-

health deal" involving both OBS and Orange. (See Exhibit 17.)  Despite the crucial

role played by OBS, the announcements were made by Orange (then FT)  (see

Exhibits 16 and 36.)  Harris alleges that it is to the interest of the conspiracy to

keep OBS out of the spotlight so that its role as the "brains" is not apparent and it

can be protected from liability under RICO.

57.    Details of many of the acts underpinning Plaintiff's allegations are provided

in Exhibit 11 (Chronological List of Predicate Acts), although Plaintiff will require

discovery in order to obtain evidence of all such acts.  Nevertheless, the available

details support, at minimum, a plausible inference that the conduct of OBS (as well

as that of the other Defendants) was unlawful. According to this Court, it is not

necessary for a Plaintiff to show that there are no legitimate explanations for a

Defendant's acts. Rather, a Plaintiff need only establish that an improper

explanation is plausible. See *Faith Enterprises Group, Inc. v. Avis Budget Group,

Inc.*, No. 1:11-CV-3166-TWT (N.D. Ga. Apr. 20, 2012.),

## CLAIM I – GEORGIA TRADE SECRETS ACT

Against Defendants OBS, ORANGE, Almerys, Ngouyombo, Cristofini and Miaux aided and abetted by G & K, HB and Landwell

## Count 1: Misappropriation of Trade Secrets against Defendants Cristofini, Ngouyombo, Miaux. Almerys, Orange and OBS.

58.     Harris incorporates and realleges each and every allegation contained in paragraphs 1 to 57 inclusive of this Complaint.

59.     Anoigma's IP constituted a trade secret (see below at paragraph 66.) Harris alleges that the misappropriation of this trade secret by OBS was a multi-stage process by which the IP was first misappropriated from Anoigma into CS, then from CS into Almerys and may also have been subsequently transferred to Orange (OBS's collaborator and co-conspirator) for the benefit of OBS.

60.     Under the Georgia Trade Secrets Act, O.C.G.A. § 10-1-760 et seq., a claim for misappropriation of trade secrets requires a party to prove that (1) it had a trade secret and (2) the opposing party misappropriated the trade secret. A party misappropriates a trade secret when, among other things, it discloses or uses a trade secret of another, without express or implied consent, knowing that at the time of disclosure or use the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. O.C.G.A. § 10-1-761(2).

61.     Specifically, under the act, "misappropriation" means:

acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (ii) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or use knew or had reason to know that his knowledge of the trade secret was (I) derived from or through a person who has utilized improper means to acquire it; (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) before a material change of his position, knew or had reason to know that it was a trade secret ad that knowledge of it had been acquired by accident or mistake. O.C. G. A. § 10-1-761(2)

62.    Anoigma's IP constituted a trade secret which Anoigma protected with confidentiality and non-disclosure agreements. Any staff member working on the IP was required to sign a confidentiality agreement. (See, for example, Exhibit 40.) Upon information and belief, third party companies with whom information was shared signed NDAs. (See Exhibits 13 and 38 for evidence of such NDAs with Orange and Almerys respectively.) The IP was valued a few months before the first alleged misappropriation at about €800,000, or about $1,200,000 at then-current exchange rates  (see Exhibit 12) and this valuation was accepted as reasonable by potential investors.

63.    The Plaintiff was one of four shareholders of Anoigma.  The Plaintiff alleges that the other three shareholders of Anoigma engaged in the first misappropriation of Anoigma's trade secret (the IP) by fraudulently transferring the IP into a

secretly-created new company, CS, in which all three of them (but not Plaintiff) were shareholders at a time when Anoigma still existed, and during which time all of them had a fiduciary duty both to Anoigma and to the Plaintiff. (See Exhibit 11 at Items 17 to 18.) Although the actual owner of the trade secret was Anoigma, since the Plaintiff held approximately 19% of the shares of Anoigma, and none of the shares of the successor company, CS, the Plaintiff alleges that her ownership interest in the trade secret was misappropriated first in this fraudulent conversion and later in subsequent fraudulent conversions of the IP.

64.     Neither CS nor these Defendants made any payment to Anoigma for these assets. The Plaintiff alleges both that the Defendants made Anoigma insolvent by transferring these assets out of Anoigma and that the Defendants knowingly took Anoigma into a fraudulent voluntary bankruptcy. (See Exhibit 11 at Items 23 to 24 for details.)

65.     Plaintiff alleges that the CS shares then became worthless due to the subsequent fraudulent conversion of the IP by Almerys. Upon information and belief, Orange and Almerys had signed NDAs with Anoigma regarding its IP (See Exhibits 13 and 35 respectively.)  Therefore, both companies had reason to know that CS did not have legitimate rights to the IP.  Moreover, Harris specifically informed Almerys in June 2010 that these assets belonged to Anoigma and that

there had not been a legitimate transfer of these assets to CS. Harris alleges that
Almerys responded with fraudulent concealment. (See Exhibit 26 and Exhibit 11 at
Item 28 for details of Harris's interaction with Almerys.)

66.     Upon information and belief, Ngouyombo provided the IP to Almerys
(initially for Anoigma and subsequently for CS) in order for Almerys to integrate
its own security technology with the IP. When CS went into bankruptcy, Harris
alleges that Almerys remained in possession of the IP.

67.     Upon information and belief, Almerys did not pay CS or its liquidator for
the IP since CS went into bankruptcy because of insufficient funds. (See Exhibit
34.) Plaintiff also alleges that CS never included the IP as an asset in their
accounts during this process of liquidation and consequently did not attempt to
monetize it through sale to any party. Plaintiff alleges that CS failed to do so
because Cristofini, at the behest of OBS, did not raise this option to Ngouyombo,
the nominal President/Director of CS so that the IP could fall into the hands of
Almerys (a subsidiary of Orange and one of OBS's co-conspirators) without
Almerys having to make any payment to acquire these trade secrets.[30] Harris
alleges that OBS is using one or both of its co-conspirators to hold the IP for OBS

---

[30] It is a matter of discovery to determine whether OBS, Almerys or Orange paid
Ngouyombo, Cristofini and/or Miaux personally (in cash or shares) for the name
CS and/or for rights to the IP (since the insolvency of CS at liquidation suggests
that nothing was paid to that company.)

until OBS chooses to exploit it. See above at paragraphs 33 to 34, 39 to 43, 45, 47 and 49.

68.     The Georgia Trade Secrets Acts provides a range of recovery for damages, including exemplary damages when the misappropriation is willful and malicious:

> (a) In addition to or in lieu of the relief provided by Code Section 10-1-762, a person is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. If neither damages nor unjust enrichment caused by the misappropriation are proved by a preponderance of the evidence, the court may award damages caused by misappropriation measured in terms of a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret for no longer than the period of time for which use could have been prohibited.
> (b) If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (a) of this Code section. O.C.G.A. § 10-1-763

69.     Harris alleges that the misappropriation of Anoigma's IP was intentional and executed willfully and maliciously with conscious disregard of Harris's rights, and that she was directly injured because she has received no compensation for the IP (of which she owned approximately 19% as a reflection of the percentage of her shareholding) which is now, she alleges, in the possession of Almerys and/or Orange and/or OBS, for the benefit of OBS. Harris claims injury in connection with the value of the past, present and future value of her proportionate ownership of the IP (based on her shareholding.) She further claims injury because she alleges

that the Defendants deprived her of the value of her shares and also prevented her

not only from receiving the money judgment awarded to her by the English court

but also from purchasing the IP for commercialization in the U.S. and reaping the

consequent profits. Harris also claims injury in connection with the proportionate

past, present and future unjust enrichment that she alleges are accrued and accruing

to the Defendants.

## Count 2: Aiding and Abetting Misappropriation of Trade Secrets against Defendants HB, G &K and Landwell

70.    Harris incorporates and realleges each and every allegation contained in

paragraphs 1 to 69 inclusive of this Complaint.

71.    Georgia, like other jurisdictions, recognizes a common law claim whereby a

secondary actor may be derivatively liable for assisting a primary actor, who by

virtue of his own actions, causes harm to the plaintiff. The theory of civil aiding

and abetting, rooted in common law, is currently encapsulated within Section

876(b) of the Restatement (Second) of Torts:  For harm resulting to a third person

from the tortious conduct of another, one is subject to liability if he:  (a) does a

tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial

assistance or encouragement to the other so to conduct himself, or (c) gives

substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person. RESTATEMENT (SECOND) OF TORTS § 876(b) (1979).

72.     Under subsection (b), the section pertinent to the present case, a party is subject to liability for harm resulting to a third person from the tortuous conduct of another if he both knows the other's conduct constitutes a breach of duty and gives substantial assistance to the other. Id. § (b). See 86 C.J.S. Torts § 105 (West updated 2009) ("As a general rule, one who counsels, advises, abets, or assists the commission of an actionable wrong by another is responsible to the injured person for the entire loss or damage."); see also *Landy v. Fed Deposit Ins. Corp.*, 486 F.2d 139, 162-63 (3d Cir. 1973); *Petro-Tech, Inc. v. Western Co. of N. Am.*, 824 F.2d 1349, 1357 (9th Cir. 1987) ("[This] Restatement provision has been applied by a number of state and federal courts in civil litigation.").

73.     It is now generally accepted law in most states that lawyers can be included as defendants in addition to their clients. (See for example *Thornwood, Inc. v. Jenner & Block*, No. 1-01-1767 (Ill. App.First Div. November 10, 2003) "Illinois [like many states] recognizes claims against lawyers for conspiring with their clients for a wrongful purpose.") This has been recognized as particularly true where there is a dispute between some corporate shareholders/directors or partners

and other corporate shareholders/directors or partners, where the lawyers,
purportedly representing the corporation or partnership, have in fact aided and
abetted the interests of one group of shareholders or directors against the others –
exactly the situation in this case. (See for example, *Granewich v. Harding*, 329 Or.
47, 985 P.2d 788 (1999) and *Loeb & Co., Inc. v. Gross*, 563 F.2d 1057 (2d Cir.
1977). That is the case with regard to both HB and Landwell. Similarly, G & K, as
a bankruptcy liquidator, owed its duties to the corporation and not to any
subcategory of shareholders or directors of that corporation.

74.     Nor can HB and Landwell claim privilege to protect them from inclusion as
defendants.  As the Supreme Court recently recognized, "[t]he fiduciary exception
is now well recognized in the jurisprudence of both federal and state courts, and
has been applied in a wide variety of contexts, including in litigation involving
common law trusts, disputes between corporations and shareholders, and ERISA
enforcement actions." *United States v. Jicarilla Apache Nation*, 131 S.Ct. 2313,
2332-33 (2011).  At least Ngouyombo and Cristofini, and probably Miaux as well
(since Anoigma was a closely held company with only the four shareholders, and
Harris, Ngouyombo and Cristofini were all directors as well), owed fiduciary
duties to Harris.

75.    Although each of these Defendants in Count 2 aided and abetted the

Defendants of Count 1 in their own particular way, Harris alleges that each of these

Defendants violated their responsibilities as fiduciaries.  Harris alleges that all of

these Defendants knew, or should have known of the misappropriation of the IP

and that all of them assisted in the fraudulent dissolution of Anoigma and/or the

fraudulent and surreptitious establishment of CS, so that all of them aided and

abetted in the misappropriation.  (See Exhibit 8 at items 13 to 15, 19, 21 to 27 for

details.)  The Plaintiff also alleges that these Defendants' actions facilitated the

later misappropriation of the assets by OBS.

76.    Harris alleges that she was directly injured by these Defendants' aiding and

abetting the other Defendants in the fraudulent conversion of the IP because she

has received no compensation for the IP (of which she owned approximately 19%

as a reflection of the percentage of her shareholding) which is now, she alleges, in

the possession of Almerys and/or Orange and/or OBS, for the benefit of OBS.

Harris claims injury in connection with the value of the past, present and future

value of her proportionate ownership of the IP (based on her shareholding.) She

further claims injury because she alleges that the Defendants deprived her of the

value of her shares and also prevented her not only from receiving the money

judgment awarded to her by the English court but also from purchasing the IP for

commercialization in the U.S. and reaping the consequent profits. Harris also claims injury in connection with the proportionate past, present and future unjust enrichment that she alleges are accrued and accruing to the Defendants.

## CLAIM II – RICO ACT

### Count 1: 18 U.S.C. § 1962 (c)

Against OBS, Orange, Almerys and Cristofini aided and abetted by Ngouyombo, Miaux, HB, G&K and Landwell

77.     Harris incorporates and realleges each and every allegation contained in paragraphs 1 to 76 inclusive of this Complaint.

78.     Harris is claiming under the private right for treble damages provided under 18 U. S. C. §1964(c) to "[a]ny person injured in his business or property by reason of a violation" of the Act's criminal prohibitions. "Congress provided civil RICO plaintiffs with the opportunity to recover treble damages, costs, and attorney's fees if they can successfully establish the elements of a RICO violation by a preponderance of the evidence. *Sedima S.P.R.L. v. Imrex* Co., 473 U.S. 479, 491-93, 105 S.Ct. 3275, 3282-83, 87 L.Ed.2d 346 (1985)" as  cited in *Midwest Grinding Company Inc v. M Spitz* U.S. 976 F. 2d 1016.

79.     The elements of a Racketeer Influenced and Corrupt Organizations Act violation under 18 U.S.C. § 1962 (c) "consist of '(1) conduct (2) of an enterprise

(3) through a pattern (4) of racketeering activity.' " *Sedima* 473 U.S. 479, 105

S.Ct. 3275. To plead the "enterprise" element of a RICO claim, plaintiffs must

adequately allege that: (1) defendants have associated for a common purpose for

engaging in a course of conduct, (2) in an ongoing organization, either formal or

informal, and (3) the various associates function as a continuing unit. See *Odom v.*

*Microsoft Corp.*, 486 F.3d 541 (9th Cir.2007) (internal quotation marks omitted).

80.     The present case involves a U.S. plaintiff who has experienced economic

injury in the U.S. from an association-in-fact enterprise through a pattern of

racketeering activity involving predicate acts, the great majority of which took

place in the U.S.

81.     Plaintiff alleges that Defendants OBS, Orange, Almerys and Cristofini

constitute an association-in-fact enterprise:

> [A]n association-in-fact enterprise is simply a continuing unit that functions
> with a common purpose. Such a group need not have a hierarchical structure
> or a "chain of command"; decisions may be made on an ad hoc basis and by
> any number of methods - by majority vote, consensus, a show of strength,
> etc. Members of the group need not have fixed roles; different members may
> perform different roles at different times. The group need not have a name,
> regular meetings, dues, established rules and regulations, disciplinary
> procedures, or induction or initiation ceremonies. *Boyle v. United States*, 556
> U.S. 938 (2009).

An association-in-fact enterprise need only have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.*

82.    OBS, Orange and Almerys actually do have a formalized relationship with one another as part of the Orange Group. All of them provide services in the e-health sector under the trade name of "Orange Business Services" and all of them use the same website, www.orange-business.com. (See paragraph 18 above.) Moreover, OBS and Orange use a particular part of that website, http://blogs.orange-business.com, for communicating information about their sector to the relevant public (See, for example, Exhibit 6.)

83.    Harris alleges that the purpose of the racketeering activity of these co-conspirators is to fraudulently acquire new technologies and/or intellectual property from small businesses or individuals holding such technologies or intellectual property, which they then commercialize in competition to the businesses or individuals from whom they acquired such technologies or intellectual property. The actions described in Harris's claim are, the Plaintiff alleges, two examples of such racketeering activity, first against Harris in the context of Anoigma and subsequently against Ngouyombo and Miaux in the context of CS.

84.    It may be that the actions alleged by Harris represent the first time that the

enterprise has engaged in fraudulent acquisition of intellectual property even

though, given the sophistication and longevity of their schemes and the sequential

victims involved as alleged by Harris, this seems unlikely. Nevertheless,

enabling the Defendants to succeed at this alleged racketeering activity is only

likely to embolden them to execute similar scheme against other victims. Indeed,

they are already advertising in English on http://blogs.orange-business.com,

soliciting small businesses or individuals with technologies or intellectual property

in e-health to come to them with their ideas. (See Exhibit 6.) The Plaintiff alleges

that the way OBS is using its blog demonstrates a classic RICO racketeering

model, with a large U.S. company luring small U.S. companies and individuals

operating in the U.S., the largest English-speaking country where high tech

intellectual property is developed, into relationships with OBS that will enable

OBS to fraudulently convert such small companies' and/or individuals' e-health-

related IP in the future.

85.    Plaintiff alleges that the association-in-fact enterprise, aided and abetted by

Ngouyombo, Miaux, HB, G&K and Landwell at various points, has engaged in a

wide range of RICO-defined predicate acts of racketeering over a period of well

over four years to date, in order to gain control of the Anoigma IP for the ultimate

benefit of U.S. Defendant OBS and to the detriment and injury of the Plaintiff, who

is both a U.S. citizen and a U.S. resident.   (See the summary of their actions above

in paragraphs 25 to 33 and see Exhibit 11 for specific details of predicate acts.)

86.     Most of the alleged predicate acts of racketeering directly involving the

Plaintiff took place in the U.S.  Also, the Plaintiff alleges that many of those acts

that did take place extraterritorially were initially designed by the Defendants to

prevent the Plaintiff in the U.S. from being able to scrutinize the actions of the

Defendants and, later, to prevent the Plaintiff from purchasing the IP and setting up

a business in the U.S. to commercialize that IP.

87.     The Plaintiff alleges, however, that some of the predicate acts of

racketeering, particularly those actions in which the Defendants turned on some of

their co-conspirators did take place extraterritorially, and that what is particularly

important about those acts is that they demonstrate how the pattern of racketeering

activity expanded to include other victims in this particular scheme.  Therefore,

these extraterritorial acts are highly relevant to the Plaintiff's allegations regarding

the Defendants' pattern of racketeering.

88.     Relatively recent consideration by this Circuit of the extraterritorial

applicability of RICO led to the following conclusion:

> The first question, one of first impression in this Circuit, is whether RICO
> applies extraterritorially at all.  Courts have divided over this issue.  Some

have concluded that RICO does not apply extraterritorially, essentially because Congress made no explicit statement to that effect. See, e.g., *Jose v. M/V Fir Grove, 801 F. Supp. 349 (D. Or. 1991)*. The more widely accepted view, and the one we adopt today, is that **RICO may apply extraterritorially if conduct material to the completion of the racketeering occurs in the United States, or if significant effects of the racketeering are felt here.** See, e.g., *North-South Fin. Corp. v. Al-Turki, 100 F.3d 1046, 1051 (2nd Cir. 1996)*; *Poulos v. Caesars World, Inc., 379 F.3d 654, 663-64 (9th Cir. 2004)* (citations omitted).[emphasis added] *Liquidation Com'n of Banco Intercontinental, S.S. v. Renta, 530 F.3d 1339 (11th Cir. 2008)*

89.    That decision was taken before *Morrison v. National Australia Bank Ltd*, 130 S. Ct. 2869 (2010), a case which has been used by other circuits subsequently to re-analyze their approach to the extraterritorial applicability of RICO.   Since this is a case of first impression in this Court post-*Morrison*, it is important to consider the issues raised by *Morrison* and to examine the analyses of other courts in the nearly four years since *Morrison*.

Under the *Morrison* test, RICO Applies to Extraterritorial Conduct

90.    *Morrison* concluded that "to ask what conduct [a statute] reaches is to ask what conduct [it] prohibits, which is a merits question." 130 S. Ct. at 2877.  In *Morrison,* the Supreme Court held that federal statutes apply to extraterritorial conduct if they give a "clear indication" that Congress intended such applicability. 130 S. Ct. at 2877-78. The Court did not adopt a "clear statement rule" or any "requirement that a statute say 'this law applies abroad'" *Id*. at 2884. Rather, the

Court required "the most faithful reading of the text" of the statute, in which "[a]ssuredly context can be consulted." *Id*. Applying this test, *Morrison* found that sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act") did not apply to transactions outside the United States. *Id.* As shown below, a "faithful reading of the text" of RICO shows that it, unlike the Exchange Act, plainly covers extraterritorial conduct, including that at issue here.

91.    The *Morrison* test should be distinguished from the earlier case law (as referenced in *Renta*) which looked for very explicit language of extraterritoriality and found "silence" without that language. Initial cases subsequent to *Morrison* from outside this Circuit misread the *Morrison* test and reverted to the previous case law approach that implies the requirement of a specific statement that "this law applies abroad." (See for example *Norex Petroleum Ltd. v. Access Industries, Inc.*, 631F.3d 29 (2d Cir. 2010) and *Cedeno v. Intech Group, Inc.*, No. 09 Civ. 9716 (JSR), 2010 U.S. Dist. (S.D.N.Y. Aug. 25, 2010)

92.    More recent post-*Morrison* cases have taken different approaches to considering cases with extraterritorial elements, and their approaches are essentially a reversion to the "conduct" and "effects" tests (see discussion below in paragraphs 101) and reconsideration of the relative centrality of "enterprise" compared to a "pattern of activity" (see paragraph 102.)

93.    Applying the *Morrison* test to RICO, one finds that RICO targets

commission of a "pattern" of "racketeering" activity -- which is defined as at least

two violations of one or more of a long list of federal statutes ("predicate acts") --

in connection with use of an "enterprise" engaged in or affecting "interstate *or*

foreign commerce*." 18 U.S.C. § 1962(a)-(c) (emphasis added). More specifically,

Section 1962, titled "Prohibited Activities," criminalizes the following conduct:

- [T]o use or invest" any "proceeds" "derived . . . from a pattern of racketeering activity [for the] acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate *or foreign commerce*." 18 U.S.C. § 1962(a) (emphasis added).

- [T]o acquire or maintain . . . an interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate *or foreign commerce* . . .through a pattern of racketeering activity. 18 U.S.C. § 1962(b) (emphasis added).

- [T]o conduct or participate" in the affairs of "any enterprise engaged in, or the activities of which affect, interstate *or foreign commerce* . . . through a pattern of racketeering activity." 18 U.S.C. § 1962(c) (emphasis added).[31]

94.    By barring "racketeering activity" relating to "any enterprise" that engages

in or affects either interstate commerce or foreign commerce, §§ 1962(a) - (c)

---

[31] RICO does not define "foreign commerce" but 18 U.S.C. § 10 states "[t]he term 'foreign commerce,' for purposes of this title, includes commerce with a foreign country." At a minimum, then, RICO reaches enterprises that "engage in" or "affect" commerce between the United States and a foreign country,

necessarily reach enterprises that engage in or affect exclusively foreign

commerce.  The Supreme Court has made clear that

> [i]n construing a statute we are obliged to give effect, if possible, to every
> word Congress used. *United States v. Menasche*, 348 U.S. 528, 538 -539
> (1955). Canons of construction ordinarily suggest that terms connected by a
> disjunctive be given separate meanings, unless the context dictates
> otherwise... See *FCC v. Pacifica Foundation*, 438 U.S. 726, 739 -740 (1978)
> *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979).

95.     Only a foreign-based enterprise could engage in or affect exclusively

foreign commerce.  As a practical matter, even if a United States-based enterprise

focused its principal business overseas, it would still, because of its location,

inevitably engage in or affect interstate commerce, at least to the "minimal" extent

required by RICO.[32] Statutes must be construed so that "no clause, sentence, or

word shall be superfluous, void, or insignificant." *United States v. Campos-*

*Serrano*, 404 U.S. 293, 301 n.14 (1971). The phrase "or foreign commerce" would

be improperly rendered "superfluous" unless §§ 1962(a) - (c) were read to cover

foreign enterprises.

96.     This reading is also compelled by the meaning of "racketeering activity" and

the structure of RICO. "Racketeering activity" includes "***any act***" which is

indictable under a long list of federal criminal statutes. 18 U.S.C. § 1961(1)

---

[32] "Only a minimal impact upon interstate commerce is necessary to support a
RICO conviction." *United States v. Johnson*, 440 F.3d 832 (6th Cir. 2006).

(emphasis added). Many of those statutes, including those alleged here, unquestionably apply extraterritorially. See, e.g., 18 U.S.C. §1956(f) (money laundering; "there is extraterritorial jurisdiction over the conduct prohibited by this section" under listed circumstances); *United States v. Schultz*, 333 F.3d 393, 402 (2d Cir. 2003) (language of 18 U.S.C. § 2314 "is broad enough to justify the federal courts in applying the statute whenever they determine that the [property was] stolen in another country"); *United States v. Kim*, 246 F.3d 186, 189 (2d Cir. 2001) (wire fraud statute, 18 U.S.C. § 1343, was amended to include "foreign commerce" "so as to reach fraud schemes furthered by foreign wires as well as by interstate wires"); *Pasquantino v. United States*, 544 U.S. 349, 643 (2005) (because "wire fraud statute punishes frauds executed in 'interstate or foreign commerce,' [it] is surely not a statute in which Congress had only domestic concerns in mind").[33]

---

[33] Other RICO predicates that expressly provide for "extraterritorial jurisdiction" include 18 U.S.C. §§ 175(a), 351(i), 832(b), 1512(h), 1513(d), 1751(k) and 2332b(e). RICO Act predicates that can expressly be committed "outside the United States" include 18 U.S.C. §§ 37(b)(2), 229(c)(2)-(4), 831(c)(3), 1116(c), 1203(b)(1), 1957(d)(2), 2281(b)(3), 2332f(b)(2), 2332g(b), 2332(h)(b), 2339B(d)(1)(C), 2339C(b)(2), 2339D(b)(3) and 2340A. See also 18 U.S.C. 1952(a) (foreign travel or transportation in aid of racketeering), 2421-23 (regarding transporting persons in foreign commerce to engage in prostitution and related offenses). And while the mail fraud statute requires use of the "Postal Service" or a "private or commercial interstate carrier," mailings sent from abroad into the United States necessarily satisfy that requirement. 18 U.S.C. § 1341.

97.     Because "racketeering activity" includes "any" violations of the predicate

act statutes and not just those occurring entirely in the United States, RICO must

apply extraterritorially, at least to the extent the predicate acts alleged would, as

here, be "indictable" if committed abroad. See *Boyle v. United States*, 129 S. Ct.

2237, 2243 (2009) ("The term 'any' [as used in RICO §1961(4), defining

"enterprise"] ensures the definition has a wide reach . . . ."). The term "any" in §

1961(1) thus works hand-in-glove with the "or foreign commerce" language in

§1962(a) - (c): to the extent a predicate act statute allows the indictable

racketeering activity to occur overseas, §1962 recognizes that the enterprise may

be located there as well. See *In re Merchs. Grain*, 93 F.3d 1347 (7th Cir. 1996)

("we construe statutes in the context of the entire statutory scheme").

98.     This is not only the "most faithful reading of the text" of RICO (*Morriso*n,

130 S. Ct. at 2883), it also avoids absurd results and comports with the statute's

purpose. See *City of Chicago v. United States Dep't of Treasury,* 423 F.3d 777 (7th

Cir. 2005) (construction "is inappropriate if it would lead to absurd results or

would thwart the obvious purposes of the statute").   A recent, post-*Morrison* case

has pointed out that

> The term "enterprise" is defined to include, among other things, any individual, corporation or other legal entity.  If the citizenship or legal auspices under which an enterprise exists were controlling or entitled to substantial weight, the applicability of the statute in a given case would depend upon a factor unrelated to the statutory purpose. For example, suppose that officials of two corporations—one incorporated in Delaware and the other in Bermuda, but both doing substantial business in the United States—conducted the respective affairs of those entities, each entity independent of the other, through patterns of mail and wire fraud or other predicate acts in the United States to the great injury of members of the American public. The idea that the officials of the Delaware corporation could be prosecuted criminally and sued civilly under RICO because their enterprise was a domestic corporation while their counterparts with the Bermudan corporation would be immune solely because the Bermudan corporation was foreign would be risible. (footnotes omitted)
> *Chevron Corp. v. Donziger*, 2012 (S.D.N.Y. May 14, 2012)

"RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO 'is to be liberally construed to effectuate its remedial purposes.' " *Sedima, S.P.R.I. v. Imrex Co.*, 473 U.S. 479, 498 (1985) (quoting Pub. L. 91-452 § 904(a), 84 Stat. 947)). See also *Boyle*, 129 S. Ct. at 2246-47 (emphasizing "expansive text" and "breadth" of RICO).

99.     Moreover, *Chevron* also points to the context of the enactment of RICO, and the concerns which led to its passage:

> [I]t is well to bear in mind that foreign enterprises have been at the heart of precisely the sort of activities—committed in the United States—that were exactly what Congress enacted RICO to eradicate. Many will recall, for example, that a RICO count in perhaps the largest criminal conspiracy case ever tried in this district, the so-called "Pizza Connection" case, rested on a

decision by members of the Sicilian Mafia to begin shipping narcotics to the United States and their development of a distribution network in this country. The RICO enterprise in that case "consisted of 'made members' ... and associates of such members, of a secret criminal organization, which operated in Sicily, the United States and elsewhere, known as 'La Cosa Nostra,' or 'the Mafia.' " No enterprise could have been closer to the core of the Congressional concerns that resulted in the enactment of RICO. To say that Congress did not intend RICO to apply unless the enterprise in question was purely domestic would be unsupportable. *Id.*

Even if RICO Language Constitutes "Silence" on Extraterritoriality, This Case Contains Sufficient Domestic Elements to Warrant Consideration

100. *Morrison* did set a bright line for exclusion of so-called "f-cubed" cases

(where all plaintiffs, defendants and action are foreign) but these cases would have

equally been excluded under the "conduct" or "effects" test. In fact, in the light of

careful reading of the case itself and subsequent interpretation of it, it appears that

*Morrison* essentially provides a reformulation of the previous "conduct" or

"significant effects" standards used in this and many other Circuits (See, for

example, Chevron's positive citing of *CGC Holding Co. v. Hutchens* 824

F.Supp.2d 1193 (D.Colo.2011), quoting its finding that

> These cases do not indicate that RICO is inapplicable merely because some of the participants in the enterprise reside outside the United States. As relevant to the allegations in the present case, RICO makes it unlawful for 'any person' associated with 'any enterprise' engaged in interstate commerce to participate in the conduct of the enterprise's affairs through pattern of racketeering activity. See 18 U.S.C. §1962(c). The focus of the statute is the racketeering activity, i.e., to render unlawful a pattern of domestic racketeering activity perpetrated by an enterprise. *Id.*

See also *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, (N.D. Cal. May 10, 2012).) While acknowledging *Morrison*, these more recent cases have actually specifically repudiated much of the actual decisions taken in those early post-*Morrison* cases and have found solid reasons to find (or potentially find) in favor of plaintiffs whose claims contained extraterritorial elements that were excluded in the early post-*Morrison* cases of *Norex* and *Cedeno.*[34]

101.   The most recent case to discuss the extraterritorial applicability of RICO was US v. Chao Fan Xu, 706 F. 3d 965 (9th Cir. 2013).  Although this is a criminal case, it reviews the post-Morrison civil RICO litigation in coming to an understanding of the circumstances under which RICO can be applied to a conspiracy with extraterritorial elements. Chao Fan Xu comes down on the side of

---

[34] Other examples of the gradual reversion to formulations similar to the "conduct" or "effects" tests include *United States v. Philip Morris USA, Inc.*, 783 F.Supp.2d 23 (D.D.C.2011),\ (where district court dismissed RICO claims because English defendant's domestic conduct was "isolated" and not by itself actionable under RICO); *In re Toyota Motor Corp.*, 785 F.Supp.2d 883 (C.D.Cal.2011) (dismissing RICO claims as insufficiently pled but observing that well-pled allegations of an "enterprise operating in the United States, consisting largely of domestic 'persons,' engaging in a pattern of racketeering activity in the United States, and damaging Plaintiffs abroad, ... might well state a claim consistent with Morrison's holding"); *CGC Holding Co.* (where plaintiffs stated cognizable RICO claim because "the racketeering activity of the enterprise...was directed at and largely occurred within the United States"); and both European Community and *Mitsui* (analogizing "[t]he nerve center test" for decision-making and consequent location of a RICO case enterprise or association-in-fact enterprise drawn from *Hertz Corp. v. Friend*, 130 S.Ct. 1181 (2010) where it was used to determine the geographic location of a corporation.)

focus on the "pattern of racketeering activity" rather than the location of the "enterprise" since in that case, it was clear that the conspiracy was planned extraterritorially but then executed in both China and the U.S. Since there was a pattern of racketeering activity committed in the U.S., the judge found against the Defendants despite the extraterritorial location of the "enterprise." In this case, Harris alleges that there is U.S. activity both in the pattern of racketeering activity committed in the U.S. (as specified in Exhibit 11, Items 3 to 6, 12, 14, 16 to 21, 23 to 28, 30, 32 to 33) and in the location of the enterprise both because of the relevance of the U.S. market and context (given the HITECH Act and its unique mandate for EHR) and because the enterprise is located in the U.S. since its brains are here.

102.   As outlined above in paragraphs 55 to 56, Plaintiff alleges that the primary "brains" behind the conspiracy was OBS, with Orange, Almerys, Cristofini and, for a time, Ngouyombo doing the "heavy lifting" to accomplish the conversion. This is not to say that the other Defendants are innocent; they are not, Plaintiff alleges, because they knowingly engaged or collaborated in, or aided and abetted the performance of, a variety of predicate acts as part of the racketeering activity. However, to the extent that Defendants Miaux and Ngouyombo lost the proportionate value of the IP attributable to them in their shares in Anoigma's

successor company (CS) Harris alleges that they have become victims as well as perpetrators of the conversion.

103. The possible double status of these Defendants as both victims and perpetrators of the conversion demonstrates Plaintiff's allegation that she was not the only victim of the conspiracy, and that the conspiracy was an extended process involving more than one victim. Moreover, Harris alleges that the Defendants have demonstrated that they are likely to attempt a similar scheme against other victims. An October 2012 posting in English only on the Orange website used by OBS[35] expresses interest "in hearing from companies and individuals involved in this cutting-edge development of medical solutions for smartphones. It that's you, or someone you know, please drop us a line in comments below." (See Exhibit 6). Harris alleges that this request is directed to potential U.S. victims who have developed their own intellectual property with market relevance to OBS.

104. "A pattern of racketeering activity consists of at least two predicate acts of racketeering committed within a ten-year period. 18 U.S.C. § 1961(5). Predicate acts are acts indictable under a specified list of criminal laws, 18 U.S.C. § 1961(1) (B), including mail fraud under 18 U.S.C. § 1341, and wire fraud under 18 U.S.C. § 1343." *Midwest* 976 F. 2d 1016 at paragraph 9. Predicate acts can also include

---

[35] in other words, over a year after *Harris v. France Telecom* was dismissed for *forum non conveniens*

the transportation of stolen goods in interstate or foreign commerce under 18
U.S.C. § 2314, and bank fraud under 18 U.S.C. § 1344.

105.   However, "a civil RICO plaintiff may no longer get by merely alleging two
predicate acts, but must also satisfy the so-called 'continuity plus relationship' test:
the predicate acts must be related to one another (the relationship prong) and pose
a threat of continued criminal activity (the continuity prong). *H.J., Inc.*, 492 U.S. at
239, 109 S.Ct. at 2900; Sedima, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14."
*Midwest* 976 F. 2d 1016 at paragraph 18.

106.   The predicate acts alleged here constitute acts of transportation of stolen
goods in interstate or foreign commerce, bank fraud, mail fraud and wire fraud that
meet the relationship prong, since they together form a pattern of related acts that
underlie the conspiracy to fraudulently convert the Anoigma IP.  The predicate acts
also meet the continuity prong involving a threat of continued criminal activity
since the co-conspirators are seeking other individuals or companies with
intellectual property in this sector so that they will have the opportunity to engage
in similar fraudulent conversion of other intellectual property.

107.   As stated in *Midwest* US  976 F. 2d 1016 paragraph 11, "Fed. R. Civ. P. 9(b)
requires that a plaintiff plead 'all averments of fraud [with] particularity,' and this
rule is of course applicable to allegations of fraud in a civil RICO complaint. See

*Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 992 (7th

Cir.1991); *U.S. Textiles, Inc. v. Anheuser-Busch Cos.*, 911 F.2d 1261, 1268 n. 6

(7th Cir.1990). Although Rule 9(b) requires that a RICO plaintiff provide only a

general outline of the alleged fraud scheme--one sufficient to reasonably notify the

defendants of their purported role in the scheme--the complaint must, at minimum,

describe the predicate acts with some specificity and 'state the time, place, and

content of the alleged communications perpetrating the fraud.' *Graue Mill*, 927

F.2d at 992."

108.    Exhibit 11 provides a chronological list of alleged predicate acts that have so

far been discovered by the Plaintiff, indicating the time, place, content, perpetrators

and relevant law underlying each specific predicate act. In *Bridge v. Phoenix Bond

& Indemnity Co. et al.*, 128 S.Ct. 2131 (2008), the Supreme Court affirmed that

"a plaintiff asserting a RICO claim predicated on mail fraud need not show, either

as an element of its claim or as a prerequisite to establishing proximate causation,

that it relied on the defendant's alleged misrepresentations." *Bridge*, 128 S.Ct. at

2145.   Those examples of fraud on which Plaintiff did rely, and for which the

statute of limitations has not yet expired, are discussed below in Claim IV.

109.    The alleged predicate acts of racketeering meet the criteria for the open-

ended concept of continuity, and at the very minimum, meet the criteria for the

closed-ended concept since, as indicated in *H.J., Inc.* 492 U.S. at 241, 109 S.Ct. at

2902. "Continuity is 'both a closed- and open-ended concept." The predicate acts

are open-ended since they demonstrate the conduct that by its nature is projecting

into the future with a specific threat of repetition and/or is part of the entity's

regular way of doing business.

110.   "An open-ended period of racketeering… is a course of criminal activity

which lacks the duration and repetition to establish continuity. A RICO plaintiff

may still satisfy the continuity requirement in that situation, however, by showing

past conduct which 'by its nature projects into the future with a threat of

repetition.' Id.[ *H.J., Inc.* 492 U.S. at 242] Such a threat of continuity exists when

the plaintiff can show (1) a 'specific threat of repetition,' (2) that the 'predicate

acts or offenses are part of an ongoing entity's regular way of doing business,' or

(3) that the defendant operates a 'long-term association that exists for criminal

purposes.' *Id.* at 242-43, 109 S.Ct. at 2902; see also *Comment, H.J., Inc.:*

*Targeting Federal RICO's Pattern Requirement to Long Term Criminal Activity,*

51 Ohio St.L.J. 713, 733-739 (1990)." *Midwest* 976 F. 2d 1016 at paragraph 20.

111.   In the alternative, there is also evidence to indicate that this case meets the

continuity requirement under the "closed-ended" concept.  "As its label suggests, a

'closed-ended' period of racketeering activity involves a course of criminal

conduct which has come to a close. To satisfy the continuity element in a closed-ended case, the plaintiff must prove a series of related predicates enduring a 'substantial period of time.' *H.J., Inc*. 492 U.S. at 242, 109 S.Ct. at 2902. The underlying rationale is that the duration and repetition of the criminal activity carries with it an implicit threat of continued criminal activity in the future." *Midwest* 976 F. 2d 1016 at paragraph 19.

112.   In determining whether a closed-ended period of racketeering rises to the level of sufficient duration and threat of repetition, "we are aided by the multifactor continuity test outlined in *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986), which survives *H.J., Inc.* See *Olive Can Co., Inc. v. Martin*, 906 F.2d 1147, 1151 n. 2 (7th Cir.1990) (*Morgan* approach fully consistent with teaching of *H.J., Inc.*). According to *Morgan*, continuity is a function of the duration of time over which the predicate acts were committed, the number and variety of predicate acts, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries. *Morgan,* 804 F.2d at 975." *Midwest* 976 F. 2d 1016 at paragraph 23.

113.   Plaintiff alleges that the period of predicate acts, beginning with the infiltration of Anoigma by Cristofini as an agent of OBS and Orange in September 2009 has already lasted well over four years. All the predicate acts in this case,

numerous in quantity and varied in type, indicate "the requisite continuity of the

underlying fraudulent activity" *U.S. Textiles*, 911 F.2d at 1266 as quoted in

*Midwest* US 976 F. 2d 1016 at paragraph 26. As specified throughout this

Complaint, Plaintiff alleges that there have been multiple schemes using a variety

of types of predicate acts in several different contexts, all ultimately designed to

further the conversion of the Anoigma IP. In addition, Plaintiff alleges that there

are multiple victims in addition to Harris since the victims include the unpaid

creditors in the fraudulent bankruptcies of Anoigma and CS, the preferred stock

shareholders of Anoigma and the shareholders of CS;[36] that the schemes can be

replicated by the Defendants against other victims, and that they have already

started looking for such victims (see Exhibit 6.)

114.   This case needs to be differentiated from *Midwest*'s analysis of similar cases

to it like *Clement Communications, Inc. v. American Future Systems, Inc.*, 1990

WL 106762, 1990 U.S. Dist. LEXIS 9165 (E.D.Pa. July 19, 1990) and other

similar cases. According to *Midwest*, "There, the plaintiff sued several former

employees for disclosing company trade secrets. The district court dismissed the

RICO suit after finding a close-ended scheme with no threat of future harm. 'Once

---

[36] It is possible that these shareholders were paid off privately outside the bankruptcy process. That is a matter of discovery, and if it were the case, such payments would provide additional examples of predicate acts of fraud.

the defendants left Clement's employ and put his trade secrets to work in their own business, the harm to Clement was done and the scheme ended.' *Id.*, 1990 WL *106762, at \*6*, 1990 U.S. Dist. LEXIS 9165, at * 16; see also *Thompson v. Paasche*, 950 F.2d 306, 311 (6th Cir.1991) (where defendant's access to the instrumentality of fraud ceases to exist, scheme is necessarily closed-ended); *Biddle Sawyer Corp. v. Charkit Chem. Corp.*, 1991 WL 60369, at \*4, 1991 U.S. Dist. LEXIS 4599, at * 11 - 12 (S.D.N.Y. Apr. 2, 1991) (dismissing RICO claim based upon diversion of business from the defendant's former employer to present employer)." *Midwest* US  976 F. 2d 1016 paragraph 22.

115.   In this case, Harris alleges that OBS and its co-conspirators did not engage in a one-time scheme with only one victim.  On the contrary, Harris alleges that OBS and its co-conspirators replicated their scheme on CS after Anoigma, and that they are in the ongoing business of illegally acquiring, or attempting to acquire, new technologies and intellectual property from third parties to re-package and then market to their business clients (see paragraphs 106 and 113 above and Exhibit 6.)  Therefore, even if this is the first time that the association-in-fact enterprise has engaged in the alleged conversion of intellectual property (which, given the sophistication and longevity of their schemes, seems unlikely), enabling

the Defendants to succeed at the fraudulent conversion alleged here, is only likely to embolden them to replicate the scheme against other victims

116. Harris claims that she has been directly injured by the conspiracy alleged here. Harris claims injury in connection with the value of the past, present and future value of her proportionate ownership of the IP (based on her shareholding.) She further claims injury because she alleges that the Defendants deprived her of the value of her shares and also prevented her not only from receiving the money judgment awarded to her by the English court but also from purchasing the IP for commercialization in the U.S. and reaping the consequent profits. Harris also claims injury in connection with the proportionate past, present and future unjust enrichment that she alleges are accrued and accruing to the Defendants.

## Count 2: 18 U.S.C. § 1962 (d)

Against OBS, Orange, Almerys, Cristofini, Miaux, Ngouyombo, HB, G&K and Landwell

117. Harris incorporates and realleges each and every allegation contained in paragraphs 1 to 116 inclusive of this Complaint.

118. Harris alleges that OBS, Orange, Almerys, Cristofini, Miaux, Ngouyombo, HB, G&K and Landwell participated in a conspiracy that injured Harris.

119. There is some controversy among circuits as to the elements of a conspiracy claim; however, *Brouwer v. Raffensperger, Hughes & Co*, 199 f.3d 961, 967 (7th Cir. 2000) laid out a clear view on this. A plaintiff "must allege (1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Brouwer* at 967.

120. The court further clarified that "in our long-established, two-part analysis of subsection (d) we have consistently required personal participation as to the first element and only an agreement that someone should perform the predicate acts." Id. at 966. The court goes on to explain that to meet the first prong in a section (c) offense, a defendant "must knowingly agree to perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner. It is an agreement, not to operate or manage the enterprise, but personally to facilitate the activities of those who do." Id.

121. Exhibit 11 specifies Plaintiff's allegations of (a) how each of the Defendants personally and knowingly performed a large number and variety of predicate acts, and (b) how certain Defendants knowingly agreed to facilitate the predicate acts by the other Defendants.

122.   Harris claims she has been directly injured by the alleged conspiracy detailed here.   Harris alleges injury to her in connection with the value of the past, present and future value of her proportionate ownership of the IP (based on her shareholding) and also by being deprived of the opportunity to purchase the IP for commercialization in the U.S. and reap the consequent profits. Harris also alleges that she has been injured in connection with the proportionate past, present and future unjust enrichment that she alleges are accrued and accruing to the Defendants.

## CLAIM III – GEORGIA RICO ACT

### Count 1: O.C.G.A. 16-14-4 (2010)  (a)

Against OBS, Orange, Almerys, Cristofini, Ngouyombo and Miaux

123.   Harris incorporates and realleges each and every allegation contained in paragraphs 1 to 122 inclusive of this Complaint.

124.   The Georgia RICO (Racketeer Influenced and Corrupt Organizations) Act O.C.G.A. §16-14-4 (2010)(a) states that it is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.

125. Plaintiff alleges that each of the above named Defendants acquired, directly or indirectly, the Anoigma IP either for themselves (where the Defendant is a corporate person) or for an entity in which they were a shareholder (where the Defendant is a real person) through a pattern of racketeering activity as outlined throughout this Complaint, with predicate acts as specified in Exhibit 11.

126. Additionally, Plaintiff alleges that OBS, Orange, Cristofini, Ngouyombo and Miaux acquired, directly or indirectly, an interest in or control of CS through the pattern of racketeering activity alleged in this case as outlined in this Complaint and as detailed in Exhibit 11, Items 3 to 27.

127. Harris alleges that she has been directly injured by the alleged conspiracy detailed here. Harris claims injury in connection with the value of the past, present and future value of her proportionate ownership of the IP (based on her shareholding.) She further claims injury because she alleges that the Defendants deprived her of the value of her shares and also prevented her not only from receiving the money judgment awarded to her by the English court but also from purchasing the IP for commercialization in the U.S. and reaping the consequent profits. Harris also claims injury in connection the proportionate past, present and future unjust enrichment that she alleges are accrued and accruing to the Defendants.

## Count 2: O.C.G.A. 16-14-4 (2010) (b)

Against OBS, Orange, Almerys, Cristofini, Ngouyombo, Miaux, HB, G&K and Landwell

128.   Harris incorporates and realleges each and every allegation contained in paragraphs 1 to 127 inclusive of this Complaint.

129.   The Georgia RICO (Racketeer Influenced and Corrupt Organizations) Act O.C.G.A. §16-14-4 (2010)(b) states that it is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

130.   Plaintiff alleges that each of the above named Defendants was associated with an enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity, as outlined in this Complaint, with predicate acts as specified in Exhibit 11.

131.   It should be noted that an "association-in-kind" enterprise is included within the definition of "enterprise" under the statute and that the statute reaches all the predicate acts previously outlined, since the findings and intent of the General Assembly (O.C.G.A. 16-14-2 (2010)) makes it clear that "This chapter shall be liberally construed to effectuate the remedial purposes embodied in its operative

provisions" and the definitions under the Georgia RICO Act include all the categories of predicate acts included here.

132. Harris alleges that she has been directly injured by the alleged conspiracy detailed here. Harris claims injury in connection with the value of the past, present and future value of her proportionate ownership of the IP (based on her shareholding.) She further claims injury because she alleges that the Defendants deprived her of the value of her shares and also prevented her not only from receiving the money judgment awarded to her by the English court but also from purchasing the IP for commercialization in the U.S. and reaping the consequent profits. Harris also claims injury in connection with the proportionate past, present and future unjust enrichment that she alleges are accrued and accruing to the Defendants.

## Count 3: O.C.G.A. 16-14-4 (2010) (c)

Against OBS, Orange, Almerys, Cristofini, Ngouyombo, Miaux, HB, G&K and Landwell

133. Harris incorporates and realleges each and every allegation contained in paragraphs 1 to 132 inclusive of this Complaint.

134. The Georgia RICO (Racketeer Influenced and Corrupt Organizations) Act O.C.G.A. §16-14-4 (2010)(c) states that it is unlawful for any person to conspire or

endeavor to violate any of the provisions of subsection (a) or (b) of this Code section.

135.  Plaintiff alleges that each of the above named Defendants conspired to violate subsections (a) and/or (b) of the Georgia RICO Act, as outlined in paragraphs 126, 130 to 131 above and in Exhibit 8.

136.  Harris alleges that she has been directly injured by the alleged conspiracy detailed here.  Harris claims injury in connection with the value of the past, present and future value of her proportionate ownership of the IP (based on her shareholding.) She further claims injury because she alleges that the Defendants deprived her of the value of her shares and also prevented her not only from receiving the money judgment awarded to her by the English court but also from purchasing the IP for commercialization in the U.S. and reaping the consequent profits. Harris also claims injury in connection with the proportionate past, present and future unjust enrichment that she alleges are accrued and accruing to the Defendants.

## **CLAIM IV – FRAUD**

Against OBS and Orange

137.  Harris incorporates and realleges each and every allegation contained in paragraphs 1 to 136 inclusive of this Complaint.

138.   Harris alleges that the Defendants, acting in concert, made fraudulent misrepresentations of material facts and also intentionally concealed material facts in order to mislead Harris in her legal actions to protect her rights and to further deprive her of her proportionate share of the value of the IP.   The Plaintiff alleges that the combined acts of these Defendants constitute a conspiracy to defraud Harris.  "A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means. " *U.S. Anchor Mfg. v. Rule Indus.*, 264 Ga. 295 (1994).

139.   "The five elements essential to a tort suit for damages resulting from a material misrepresentation constituting fraud are: (1) that the defendant made the representations; (2) that at the time he knew they were false; (3) that he made them intending to deceive the plaintiff; (4) that the plaintiff justifiably relied on the representations; and (5) that the plaintiff sustained the alleged loss and damage as the proximate result of their having been made." *Parrish v. Jackson W. Jones, P. C.*, 278 Ga. App. 645, (2006) (citations omitted).

140.   Implicit to the meaning that a defendant intended to deceive is that a defendant may have intended to mislead or to convey a false impression, not simply to communicate false information.

141. Harris alleges that the Defendants' most recent deception that took place entirely in the U.S. partially involved creating the false impression that France, instead of the U.S., was the location for the key fraudulent acts of the conspiracy, in order to argue, as they did, effectively, that Harris's U.S. lawsuit of 2011 should be dismissed on the basis of *forum non conveniens*. Harris, relying on this fraud, did not appeal the decision in that case, and was damaged thereby in terms of the costs of the previous lawsuit, and the loss of time (and potential loss of evidence) in pursuing the present lawsuit.

142. Moreover, Harris alleges that this was not the only purpose of the conspiracy to defraud by Defendants OBS and Orange, and the consequent damage to Harris was greater than simply the damages outlined in paragraph 141 above. By misleading the Plaintiff, Harris alleges that the Defendants provided themselves with a "cover" and time to move the IP into their control but out of public view. The Plaintiff alleges that the Defendants' acts damaged Harris by continuing to deprive her of the benefit of the IP and unjustly enriching the Defendants, through their retention of the IP for the potential use of OBS.

143. Harris alleges that the specific examples of fraud (in the form of fraudulent concealment) occurred in the Declarations made by OBS and by Cristofini on behalf of Orange as part of Orange's defense in *Harris v. France*

*Telecom et al.* It should be noted that OBS was not a party to that suit, and that its declarations were made to show its independence from Orange in various ways. (See Exhibits 1, 3 and 4.) Harris alleges that the factors outlined in paragraphs 141 and 142 above underlie the deception perpetuated by OBS. Although Harris, referencing Helkov's online resume in *Harris v. France Telecom et al* (see Exhibit 17), noted in that case that Helkov was jointly supervised by both a U.S. and a French supervisor, O'Brien on behalf of OBS stated "Mr. Helkov is an employee of OBS and is located in Atlanta. He reports to me in Atlanta." (Exhibit 3 at 4.) Harris alleges that his omission of the joint supervision of Helkov by an executive of Orange in France was fraudulent concealment for the purpose of misleading the court and the Plaintiff. Harris alleges that the purpose of O'Brien's statement was to distance OBS from the actions of its co-conspirator, Orange, by suggesting that collaboration between them was minimal. Additionally, (a) O'Brien repeatedly uses the term "medical device industry" (Id. at 3 and at 4) rather than the broader term of e-health (in order, Harris alleges, to make OBS's interest in EHR less obvious) and (b) claims that e-health is of relatively minor importance to OBS, despite his acknowledgment of Helkov as vice-president for e-health in the U.S., a position involving, according to Helkov's on-line resume (see Exhibit 17), leadership of a team of 50 staff.

144. O'Brien's statements were intended to convey false impressions, Harris alleges. OBS and Orange work closely in the medical area and their interests and expertise are broad, and OBS, with a significant e-health focus, has been involved in pursuing solutions related to EHR (like the Anoigma IP) since at least 2007. (See above at paragraphs 18 to 19 and 25 as well as Exhibits 2, 5 and 6.) Harris alleges that O'Brien's fraudulent concealment had two purposes: (a) to direct the attention of the Plaintiff and the Court away from the U.S., concealing the role of OBS as the "brains" in the collaboration with Orange,[37] as indicated in paragraph 56 above, and (b) to provide a "cover" and time for the Defendants to take control of the IP and arrange to hold it out of sight for OBS, thus both continuing to deprive Harris of the benefit of the IP and also retaining the IP for OBS to use for its own enrichment.

145. Harris alleges that Cristofini's statements in his Declarations to the U.S. court in March and June 2011 (see Exhibits 15 and 28) also were designed to focus attention on Defendants in France, and to indicate that he acted on his own, not as an agent of OBS and its co-conspirators. Harris alleges that Cristofini used diversionary tactics (by focusing on his email statement that his consulting to

---

[37] Harris alleges that OBS was making the implicit argument that the fraudulent acts underlying the Plaintiff's case were directed from France and that even if Orange was a perpetrator of some of these acts, there was no connection between Orange and OBS in this regard.

Anoigma would be done by him during days off he amassed in compensation for

having logged work hours in excess of his contracted 35-hour work week at

Orange[38]) rather than on the real conflict of interest in order to distract the Court

from the real conflict of interest issues since, she alleges, close examination of the

circumstances indicate that the actual conflict of interest (arising from becoming

one of only four shareholders and a director in a company that was in active

negotiations with his employer -- and he himself was the one engaging in such

negotiations on behalf of his employer) would have been untenable unless

Cristofini were such an agent (see above at paragraphs 37 to 38,) Harris did in fact

rely on the fraud allegedly perpetrated by the Defendants. This reliance was

reasonable, since the Court was also convinced of their arguments that the center

of the claim was in France, and not in the U.S.

146. The Plaintiff claims that she has been directly injured by the fraud that she

alleges has been perpetrated by the Defendants. Harris claims injury in connection

with the value of the past, present and future value of her proportionate ownership

of the IP (based on her shareholding.) She further claims injury because she alleges

that the Defendants deprived her of the value of her shares and also prevented her

not only from receiving the money judgment awarded to her by the English court

---

[38] See Exhibit 25 at 4 and Exhibit 28 at 3, paragraph 5

but also from purchasing the IP for commercialization in the U.S. and reaping the consequent profits. Harris also claims injury in connection with the proportionate past, present and future unjust enrichment that she alleges are accrued and accruing to the Defendants.

PRAYER FOR RELIEF

WHEREFORE, Harris prays for Judgment against the Defendants as follows:

For temporary and permanent injunctive relief against the Defendants, and that the Defendants, their officers, agents, representatives, servants, employees, attorneys, successors and assignees, and all others in active concert or participation with the Defendants, be enjoined and restrained from continuing to violate the laws alleged herein; and  be enjoined and restrained from assisting, aiding, or abetting any other person or business entity in engaging in or performing any of such and be enjoined;

For actual damages, in an amount to be proven at trial and treble damages as appropriate;

For disgorgement of the Defendants' ill-gotten profits;

For attorneys' fees and costs;

For exemplary and punitive damages, and

For such other or additional relief as is just and proper.

Dated: _March 4_ , 2014

Respectfully submitted,

By: _Marcia Harris_

Marcia Harris

6257 N. McCormick Road, # 214

Chicago, IL 60659

Email: marciaharris@mail.com

Tel: 312-513-9896

List of Exhibits

Exhibit 1        Declaration of David Newman March 7, 2011

Exhibit 2        OBS 2007 Press Release regarding Collaboration with Igeacare

Exhibit 3        Declaration of Robert O'Brien June 3, 2011

Exhibit 4        Declaration of William W. Johnson, June 1, 2011

Exhibit 5        Overview of Orange Business Services (i.e. OBS and Orange)
                 in Healthcare, downloaded March 2011

Exhibit 6        Orange Business Services (i.e. OBS and Orange) on line
                 advertising for new technologies and intellectual property in
                 healthcare, downloaded October 28, 2012

Exhibit 7        Cristofini's email of November 15, 2009 with translation

Exhibit 8        English Judgment (Harris v. Anoigma and CS) of December 23,
                 2010

Exhibit 9        Signed Companies House Document dated January 29, 2009
                 Evidencing Harris's Acquisition of Shares in Anoigma and
                 Letter from Martin Bale dated November 27, 2009 Evidencing
                 Harris's Purchase of Those Shares

Exhibit 10       Signed Companies House Document dated December 1, 2008
                 Evidencing Harris's Appointment as a Director of Anoigma

Exhibit 11       Chronological List of Predicate Acts

Exhibit 12       Anoigma Investment Term Sheet of November 2009

Exhibit 13       NDA Form Provided to Anoigma by Orange in May 2009

Exhibit 14       Letter of Intent Provided to Anoigma by Orange in June 2009

| Exhibit 15 | Declaration of Patrice Cristofini March 4, 2011 |
| --- | --- |
| Exhibit 16 | Orange Business Services Press Release of March 18, 2009 Regarding Contract with Sorin |
| Exhibit 17 | Online Resume of Niels Helkov |
| Exhibit 18 | Email of October 4, 2009 from Mandy Hutchison, Beer & Partners, Showing Interest in Investing Pre-revenue |
| Exhibit 19 | Correspondence between Harris and G & K between March and June 2010 |
| Exhibit 20 | Information from CS website, available online beginning on or about November 10, 2010 with translations |
| Exhibit 21 | CS statement of November 23, 2010 in *Harris v. Anoigma and CS* (ET3-1 through ET3-4) |
| Exhibit 22 | CS Formation Documents dated January 6. 2010 as well as Bank Statement of Formation dated December 21, 2009 |
| Exhibit 23 | Ngouyombo's Note Published in November 2010, with translation of Ngouyombo's self-description and description of U.S. market |
| Exhibit 24 | Service Agreement with Cristofini |
| Exhibit 25 | Cristofini's emails of August 17 and September 6, 2009 regarding Service Agreement and translations of these |
| Exhibit 26 | Harris's emails with Almerys in June 2010 |
| Exhibit 27 | Orange Business Service press release of February 2013 regarding Almerys |
| Exhibit 28 | Declaration of Cristofini, June 7, 2011 |

| Exhibit 29 | Cristofini's Online Resume |
|---|---|
| Exhibit 30 | Email from Cristofini of July 22, 2009 with translation |
| Exhibit 31 | Email from Dominique Valentiny, potential investor, to another potential investor with translation |
| Exhibit 32 | Ngouyombo's acquisition of Cloud Santé website on November 26, 2009 |
| Exhibit 33 | Online resume of Frederic Attia |
| Exhibit 34 | Liquidation Documentation for CS showing that a judgment for insolvency based on insufficient funds was made against CS on January 13, 2012 and the company was liquidated on January 16, 2012, with translation |
| Exhibit 35 | NDA with Almerys, with translation |
| Exhibit 36 | Announcement of implementation of Sorin collaboration with Orange |
| Exhibit 37 | Evidence of confidentiality agreement with staff member (Sneha Manohar) |