[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-10553
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cv-00641-TWT

MARCIA HARRIS,

Plaintiff-Appellant,

versus

ORANGE S.A., et al.,

Defendants,

ORANGE BUSINESS SERVICES U.S., INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(December 30, 2015)

Before MARTIN, JILL PRYOR and ANDERSON, Circuit Judges.

PER CURIAM:

Marcia Harris appeals the district court's dismissal of her complaint against Orange Business Services U.S., Inc. ("OBS"), a Delaware corporation located in Georgia; Orange S.A. ("Orange"), a corporation located in France; Almerys S.A.S. ("Almerys"), a corporation located in France; Dr. Patrice Cristofini; Dr. Yves Miaux; Barbara Ngouyombo; Hammond Bale Solicitors L.L.P. ("HB"), a law firm located in the United Kingdom; Griffin and King Ltd ("GK"), a law firm located in the United Kingdom; and Landwell & Associés/Partners ("Landwell"), a partnership located in France, in her action alleging violations of the Georgia Trade Secrets Act, Ga. Code Ann. §§ 10-1-760 *et seq.* ("GTSA"), the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961 *et seq.*, the Georgia RICO Act, Ga. Code Ann. §§ 16-14-1 *et seq.*, and common law fraud.

On appeal, Harris argues that the district court erred in dismissing her claims against the non-OBS defendants for failure to serve them. She further argues that the district court erred in concluding that she lacked standing to bring federal RICO claims, state RICO claims, and claims under the GTSA against OBS. Finally, as to her fraud claims, she argues—for the first time on appeal—that the district court erred in dismissing her fraud claims for failure to state a claim on the basis that OBS did not owe her a fiduciary duty. After careful consideration, we affirm.

## I. BACKGROUND

Harris, who proceeds *pro se* but is licensed to practice law, filed a complaint alleging violations of the GTSA against all defendants (Count 1), violations of the federal RICO Act against all defendants (Count 2), violations of the Georgia RICO Act against all defendants (Count 3), and common law fraud against OBS and Orange (Count 4).

Harris was a director, shareholder, and employee of Anoigma Ltd. ("Anoigma"), a British high tech health care company.  Initially, she, Ngouyombo, and Miaux were the company's only shareholders.[1]  During her time at Anoigma, the company developed medical-records software that constituted new intellectual property (the "IP").  Harris and Ngouyombo presented the IP to Cristofini, who represented Orange at the time.  She alleges that Orange then discussed the IP with OBS, Orange's United States affiliate.

After OBS discovered the IP's profit potential, it encouraged Orange to express interest in Anoigma and to install Cristofini as a shareholder and officer there.  Not long after, Cristofini became the fourth shareholder of Anoigma and obtained a director position in the company.  Sometime after Cristofini joined Anoigma, he, Miaux, and Ngouyombo secretly created a new company, Cloud

---

[1] At the motion to dismiss stage, we accept the well-pleaded allegations in the complaint as true and view them in the light most favorable to Harris.  *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012).

3

Sante S.A.S. ("CS"), and transferred the IP to CS.  The defendants then began

efforts to remove Harris from her directorship of Anoigma, which they ultimately

succeeded in doing.

Harris brought an action in England against Anoigma and CS, alleging,

among other things, wrongful termination.  Neither Anoigma nor CS appeared to

contest Harris's allegations.  The English court awarded Harris a monetary

judgment consisting of loss of earnings, loss of statutory rights, improperly

deducted wages, and other costs.

After her removal as director, Harris entered negotiations to purchase the IP,

with the intention of setting up a company to market it in the United States.  She

became aware of the IP's transfer to CS during the course of these negotiations.

Before Harris could collect her wrongful termination judgment or complete her

purchase of the IP, the defendants deliberately moved Anoigma into bankruptcy.

The defendants then transferred the IP from CS to Almerys, a subsidiary of

Orange, and engineered the bankruptcy of CS.

Harris filed suit against Orange, Cristofini, Miaux, Ngouyombo, and HB in

the Northern District of Illinois (the "Illinois Action") alleging claims similar to

those she alleges here.  The district court in that case dismissed the action on the

basis of *forum non conveniens*, noting that Harris should have brought her

complaint in a foreign court.  Harris did not appeal the district court's judgment.

4

Harris then filed the current action, contending that both transfers of the IP were fraudulent. Her complaint alleges that, as a result of the fraudulent transfers of the IP and the bankruptcies, she was deprived "of the value of her shares," prevented from collecting on the money judgment awarded to her by the English court, and prevented from purchasing the IP "for commercialization in the U.S." She seeks to distinguish this action from the Illinois Action by naming additional defendants and adding allegations of fraud arising from declarations made during the Illinois Action. She alleges that these declarations "were designed to divert attention away from the central role of OBS, a U.S. company," in the alleged conspiracy, thereby compelling dismissal of the action on *forum non conveniens* grounds and allowing the defendants to further the conspiracy. She also contends that she relied on fraudulent omissions the defendants committed during the Illinois Action in deciding not to appeal the court's dismissal of that action, and "was damaged thereby in terms of the costs of the previous lawsuit, and the loss of time (and potential loss of evidence) in pursuing the present lawsuit."

OBS moved to dismiss Harris's claims against it. The district court granted OBS's motion to dismiss on November 28, 2014 (the "November Order"). The court noted that Harris had not addressed the issue of standing in opposing dismissal and concluded that she lacked standing to assert a federal or Georgia RICO claim because "to the extent that there is a plausible RICO claim . . . it

belongs to Anoigma, not the Plaintiff." The court also concluded that Harris

lacked standing to assert her GTSA claim because she had no legal interest in the

trade secret. Finally, the district court ruled that Harris had failed to state a claim

for fraud, noting that the only fraud she alleged concerned OBS's failure to

disclose certain facts, and that she had failed to establish that OBS owed her any

duty to disclose. Harris appealed the November Order.

The district court next issued an order to show cause why the action as to the

remaining defendants should not be dismissed for lack of service, observing that

the action had, at that point, been pending for more than eight months without any

proof of service or substantial proceedings of record taking place with respect to

any defendant other than OBS. Harris argued in response that the six-month time

limit to effectuate service in the Federal Rules of Civil Procedure does not apply to

service in a foreign country. She also requested that the district court not enter its

proposed order due to her pending appeal of the November Order.

The district court dismissed the action against the non-OBS defendants,

noting that Harris's only response to the show cause order was that the rules of

service do not apply in a foreign country. The court ruled that Harris was required

to show diligence in serving foreign defendants and had failed to do so. The court

then entered a final judgment dismissing the action against all remaining

defendants.[2]

## II. STANDING

We first address the district court's dismissal of Harris's federal and Georgia

RICO and GTSA claims against OBS for lack of standing.  When a district court

dismisses a plaintiff's claim for lack of standing, we review the court's legal

conclusions *de novo*, and its factual findings for clear error.  *McCullum v. Orlando*

*Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1141 (11th Cir. 2014).

<u>RICO Claims</u>

The federal RICO act makes it illegal "for any person employed by or

associated with any enterprise engaged in, or the activities of which affect,

interstate or foreign commerce, to conduct or participate, directly or indirectly, in

the conduct of such enterprise's affairs through a pattern of racketeering activity."

18 U.S.C. § 1962(c).  As relevant here, the Georgia RICO statute makes it

"unlawful for any person, through a pattern of racketeering activity or proceeds

---

[2] Apparently not having received the final judgment, Harris subsequently filed a motion requesting that the district court amend the November Order to state that it presented a controlling question of law to allow Harris to file an interlocutory appeal in the event the November Order was not considered a final judgment.  She also filed a separate motion requesting that, in the event the district court did not amend the November Order as requested, the court transform the November Order into a final judgment pursuant to Federal Rule of Civil Procedure 54(b).  The court denied both motions as moot, as it had already entered final judgment of dismissal.  We issued to the parties a question regarding the finality of the order under appeal.  The appeal ultimately was allowed to proceed because, even if Harris's Notice of Appeal from the November Order was premature, it was cured by the subsequent entry of final judgment.

derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." Ga. Code Ann. § 16–14–4(a).  It also makes it "unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity." Ga. Code Ann. § 16–14–4(b).

In order to state a civil claim under either statute, a plaintiff must establish that the alleged injury directly was caused by the RICO violation.  *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida, Inc.*, 140 F.3d 898, 906 (11th Cir. 1998).[3]  The plaintiff must have been injured in her business or her property by the racketeering conduct constituting the violation, and the damages must flow from commission of the predicate acts.  *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1291 (11th Cir. 2006).  Thus, "a party whose injuries result 'merely from the misfortunes visited upon a third person by the defendant's acts' lacks standing to pursue a claim under RICO."  *Bivens*, 140 F.3d at 906 (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267 (1992)).  Applying this principal, we have held that "losses suffered by a company's stakeholders as a result of racketeering activity against the company do not give them standing under RICO" because

---

[3] Because the Georgia RICO statute was modeled on and is analogous to the federal RICO statute, we look to federal authority in determining standing to sue under the state statute. *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1294 (11th Cir. 2006).

"[s]uch an injury is too indirect or 'derivative' to confer RICO standing." *Bivens*,

140 F.3d at 906.  Notably, "[a] plaintiff's status as a creditor or stockholder,

however, does not preclude standing for RICO violations if the plaintiff has alleged

an injury proximately caused by the defendants' acts of racketeering that target the

plaintiff." *Beck v. Prupis*, 162 F.3d 1090, 1096 n.10 (11th Cir. 1998) *aff'd*, 529

U.S. 494 (2000).

The critical question in determining whether a shareholder has standing to

file a RICO action is whether or not the plaintiff suffered a harm that stands

separate and distinct from the harm suffered by the corporation.  *Bivens*, 140 F.3d

at 908.  Our precedent is clear that a shareholder lacks RICO standing "if the injury

alleged was suffered only as a result of harm to the corporation." *Id*.  In other

words, the harm suffered by the plaintiff shareholder cannot be "purely contingent"

on the harm suffered by the corporation.  *Holmes*, 503 U.S. at 271.

Harris's claims fail this test.  Each of Harris's primary alleged injuries

flowed from her status as a shareholder and the diminution in the value of her

shares.[4]  Indeed, she explicitly stated as much eight times in her complaint,

alleging that her injuries were "based on her shareholding."  Her complaint

---

[4] In her brief, Harris asserts that the defendants also "wrested" her shares from her.
Though this injury arguably may be sufficiently distinct to confer standing, *see Bivens*, 140 F.3d
at 907, Harris raises this argument for the first time on appeal.  We therefore do not consider it.
*See Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008).

principally alleged that she received no compensation as a shareholder of Anoigma when the company's IP was transferred to CS, was deprived of the value of her shares in Anoigma, and was prevented from purchasing the IP.

Accepting Harris's allegations as true, her injuries are indistinguishable from the injuries inflicted on Anoigma.  In the absence of injury to Anoigma, Harris would not have been harmed.  By fraudulently transferring the IP to CS, the defendants irreparably damaged Anoigma's value, and in so doing, necessarily harmed the proportionate value of Anoigma owned by Harris.  In a very real sense, as the owner of approximately 19% of Anoigma's outstanding shares, Harris suffered approximately 19% of the same harm Anoigma suffered.   Similarly, Harris's injury in being unable to benefit from purchasing the IP mirrors Anoigma's injury in being unable to benefit from selling it.  In either case, Harris alleged no injury distinct from that suffered by Anoigma.

In apparent recognition of this Court's clear precedent as regards shareholder standing, Harris attempts to distinguish her circumstances by arguing that she suffered a distinct and peculiar injury not suffered by Anoigma's other shareholders.  She reasons that Miaux, Ngougombo, and Cristofini all became shareholders of CS, the entity to whom the IP was transferred.  As such, in a sense, she was the only party deprived of the value of the IP.  She contends that suffering

10

an injury distinct from other shareholders (but not the corporation) is sufficient to confer standing.

We are unpersuaded by Harris's argument because it misconstrues the relevant case law. True, some courts have recognized standing in situations "where the shareholder suffers an injury which is separate and distinct from that of other shareholders." *Grafman v. Century Broad. Corp.*, 727 F. Supp. 432, 435 (N.D. Ill. 1989). However, far from creating an exception to the general rule that a shareholder must suffer an injury distinct from that of the corporation to have standing, these cases are wholly consistent with it. Tellingly, none of the cases Harris cites held that a plaintiff shareholder has individual standing to sue for an injury suffered by a corporation. In fact, most of the cases Harris cites explicitly note the general rule "that there is no shareholder standing to assert RICO claims where the harm is derivative of harm to the corporation." *Sparling v. Hoffman Constr. Co.*, 864 F.2d 635, 640 (9th Cir. 1988); *see also Leach v. FDIC*, 860 F.2d 1266, 1273-74 (5th Cir. 1988) (recognizing cases holding that "minority shareholders lacked standing under RICO to sue because they had not alleged any injury to their property that was distinct from any injury the corporation may have suffered"); *Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir. 1986) (holding that plaintiffs lacked standing because "[t]he legal injury, if any, was to the firm").

11

The few cases Harris cites that have recognized a plaintiff shareholder's standing to sue concerned injuries inflicted directly on the plaintiff shareholder, not the corporation.  In *Bivens*, for example, we recognized standing for a creditor to sue for the undervaluation of a company's assets during bankruptcy proceedings because "[t]he sale of the [asset] for a higher price would have directly benefitted major creditors . . . because they would have been able to recover a greater percentage of the debts owed to them.  In contrast, the sale of the [asset] for a higher price *would have little impact on the shareholders and the corporation*, since the additional funds from the sale would have been used to satisfy creditors instead of going to shareholders."  341 F.3d at 908 (emphasis added).  Another case, *Grafman*, recognized a plaintiff's standing to sue defendants who had acted to dilute his voting shares.  727 F. Supp. at 434.  These actions singled out the plaintiff from other shareholders and harmed him.  Importantly, however, they did not harm the corporation at all.  In fact, the district court in that case explicitly dismissed any "allegations concern[ing] harm to [the corporation]." *Id.* at 435.  Unlike the plaintiffs in *Bivens* and *Grafman*, Harris has not suffered a distinct injury.  She therefore lacks standing to pursue her claims.

This result becomes clear when considering the policy goals governing RICO standing requirements.  In evaluating whether a plaintiff has suffered a direct injury sufficient to confer standing, we consider the motivating principles

animating the injury requirements in RICO cases. *See Williams*, 465 F.3d at 1288 (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006)) (discussing the proximate cause standard in RICO cases).[5]  These principles include (1) reducing the difficulty in ascertaining the amount of damages attributable to the RICO violation as distinct from other independent factors and (2) reducing the risk of duplicative recoveries. *Id.*  Granting standing to Harris in this case would advance neither of these principles.  First, it would be difficult, if not impossible, to determine accurately the proportionate reduction in Anoigma's value attributable to the defendants' conduct as opposed to factors like market conditions, poor business practices, or failure to anticipate developments in the financial markets. *See Holmes*, 503 U.S. at 272-73.  Second, to the extent that the defendants' conduct has harmed Anoigma's value, Anoigma can be counted on to vindicate that interest. *See id.*  Recognizing Harris's right to sue for the same injury would only increase the risk of duplicative recovery, particularly since she proposes no method of apportioning a possible recovery between herself and Anoigma. *See id.*

Harris did allege one injury that is unrelated to her status as an Anoigma shareholder.  She pled that the defendants' racketeering activity moved Anoigma

---

[5] There is "significant overlap" between proximate cause and standing requirements in RICO cases. *Williams*, 465 F.3d at 1287.  "[A] plaintiff who lacks standing to vindicate a derivative injury also will be unable to show proximate cause." *Id.* at 1287 n.4 (quoting *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 613 (6th Cir. 2004)).

and CS into bankruptcy, thus preventing her from collecting on her English judgment for wrongful termination.  Although this injury does not arise out of Harris's status as a shareholder, it does arise out of her status as a creditor.  It thus raises analogous standing issues as her other injuries.  Like a shareholder, "[a] creditor will have RICO standing only when his injury passes the directness test . . . which will not be the case if the injury alleged was suffered only as a result of harm to the corporation. *Bivens*, 140 F.3d at 908.  This injury, like the others Harris alleges, is insufficient to confer RICO standing.  Harris's inability to collect on her English judgment is a direct result of harm to Anoigma and CS.  Had the defendants never harmed Anoigma and CS by deliberately moving them into bankruptcy, Harris would have collected her judgment and suffered no injury.

<u>GTSA Claims</u>

To file a claim under the GTSA, Ga. Code Ann. § 10–1–760 *et seq*., a plaintiff must prove that "(1) it had a trade secret and (2) the opposing party misappropriated the trade secret."  *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1290-91 (11th Cir. 2003) (internal quotation marks omitted).  The GTSA defines "misappropriation" as "[a]cquisition of a trade secret *of another* by a person who knows or has reason to know that the trade secret was acquired by improper means." Ga. Code Ann. § 10–1–761(2)(A) (emphasis added).  The precise meaning of "a trade secret of another" is unclear.  In fact, "whether

14

ownership is a necessary element for standing to bring a GTSA claim is an open question in Georgia." *Candy Craft Creations, LLC v. Gartner*, No. CV 212-091, 2015 WL 1541507, at *17 (S.D. Ga. Mar. 31, 2015).

But we need not decide that issue here. Regardless of whether mere possession of misappropriated property is sufficient to confer standing or whether ownership is required, Harris failed to allege that she had an actionable interest in the IP. She admitted in her complaint that "the actual owner of the trade secret was Anoigma." Moreover, she alleged neither that she is in possession nor that she was ever in possession of the IP. Indeed, such an allegation seemingly would conflict with her claim that she was injured by deprivation of an opportunity to purchase that same IP. Further, Harris advances no legal authority supporting her assertion that the deprivation of an opportunity to purchase property is an interest sufficient to confer standing. Absent any actionable interest in the IP, Harris's GTSA claim fails for lack of standing.

## III. FAILURE TO STATE A CLAIM

Harris's next claim is for common law fraud. We review *de novo* the district court's dismissal for failure to state a claim. *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1187 (11th Cir. 2002). In doing so, we accept the plaintiff's factual allegations as true. *Id.* at 1188. We note, however, that conclusory allegations and

conjecture are insufficient to survive a motion to dismiss. *Am. United Life Ins. Co.*
*v. Martinez*, 480 F.3d 1043, 1064 (11th Cir. 2007).

Under Georgia law, a plaintiff asserting a claim for fraudulent
misrepresentation must prove five essential elements: (1) the defendant made
representations, (2) knowing they were false, (3) intentionally and for the purpose
of deceiving the plaintiff, (4) which the plaintiff reasonably relied on, (5) with the
proximate result that the plaintiff incurred damages. *Williams v. Dresser Indus.,*
*Inc.*, 120 F.3d 1163, 1167 (11th Cir. 1997).

Harris does not allege that OBS made any affirmative misrepresentations to
her.  Instead, she argues that OBS had an obligation to disclose certain facts about
its involvement in the e-health industry and her prior lawsuit.  The suppression of a
material fact that a party is under obligation to communicate may constitute fraud.
*Williams*, 120 F.3d at 1167.  Generally speaking, "[w]here one person sustains
towards another a relation of trust and confidence, his silence when he should
speak or his failure to disclose what he ought to disclose constitutes fraud in law
just as do actual affirmative false representations." *Tigner v. Shearson-Lehman*
*Hutton, Inc.*, 411 S.E.2d 800, 802 (Ga. Ct. App. 1991) (citing *Perkins v. First*
*Nat'l. Bank of Atlanta*, 143 S.E.2d 474, 484 (Ga. 1965)).  This obligation to
communicate or disclose may arise from the confidential relations of the parties or
from the particular circumstances of the case, but it must exist before a party may

16

be found liable for fraud based upon an omission or concealment. *Williams*, 120

F.3d at 1167.  Business relationships generally are not confidential relationships,

unless the parties have a history of business dealings or the kind of relationship

that is not arms-length. *Id.* at 1168.

Here, the district court did not err in dismissing Harris's fraud claim.  The

only argument she advances on appeal is that Cristofini was acting as an agent for

OBS, and that because Cristofini owed her a fiduciary duty as a fellow shareholder

of Anoigma, as Cristofini's principal, OBS owed her the same duty.  She reasons

that because of this duty, OBS's failure to affirmatively disclose a number of facts

(concerning its true involvement in the e-health industry and her prior lawsuit)

constituted fraudulent misrepresentation.

Although Harris alleged in her complaint that Cristofini was acting as an

agent for OBS, she never explained to the district court why or how an agent's

individual fiduciary duty to a third party arising out of the agent's relationship with

the third party would create an affirmative obligation on the part of his principal to

disclose material facts about its own operations to the third party.  Even now, she

cites no legal authority for that proposition.  Harris's shareholder relationship with

Cristofini may have imposed on *Cristofini* an affirmative obligation to disclose

information to her, but she had no such relationship with OBS.  Her relationship

with OBS—to the extent there was a relationship prior to the Illinois Action—was

17

hardly one of "trust and confidence." *Tigner*, 411 S.E.2d at 802.  Harris presents

no basis for any obligation on the part of OBS to disclose to her.  Regardless,

Harris failed to raise this issue before the district court, and, as a result, we need

not consider it.  *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th

Cir. 2004).

## IV. FAILURE TO EFFECT TIMELY SERVICE ON NON-OBS DEFENDANTS

Harris's only remaining claims concern the non-OBS defendants.[6]  We

review for abuse of discretion the district court's dismissal of the claims against the

non-OBS defendants for failure to effectuate timely service on those defendants.

*Rance v. Rocksolid Granit USA, Inc.*, 583 F.3d 1284, 1286 (11th Cir. 2009).

Under this standard, we will affirm unless the district court made a clear error of

judgment or applied the wrong legal standard.  *Id.*

Federal Rule of Civil Procedure 4 generally requires a plaintiff to effectuate

service on a defendant within 120 days after a complaint is filed.  Fed. R. Civ. P.

4(m).  That time limit does not apply, however, when a plaintiff is attempting to

serve an individual in a foreign country.  *Id.*  We have not held in a published

decision whether or what time constraints apply to service on foreign defendants.

*See Regenicin, Inc. v. Lonza Walkersville, Inc.*, 997 F. Supp. 2d 1304, 1317 (N.D.

---

[6] Harris asserted common law fraudulent misrepresentation claims against those defendants.

Ga. 2014). Indeed, there is a considerable difference of opinion among circuits regarding what—if any—time limits apply to service of process on a foreign defendant. *Compare Lucas v. Natoli*, 936 F.2d 432, 432-33 (9th Cir. 1991) (no time limit), *with Nylok Corp. v. Fastener World Inc.*, 396 F.3d 805, 807 (7th Cir. 2005) (time is "not unlimited), *and Mentor Ins. Co. (U.K.) Ltd. v. Brannkasse*, 996 F.2d 506, 512 (2d Cir. 1993) (attempt to serve must be made within 120 days).

Specific time limits aside, "[m]ost courts faced with a challenge to the timeliness of foreign service have applied a 'flexible due diligence' standard to determine whether the delay should be excused." *Lozano v. Bosdet*, 693 F.3d 485, 488-89 (5th Cir. 2012) (internal quotation marks omitted). We have affirmed decisions based on similar considerations in the context of domestic service of process. *Lepone-Dempsey v. Carroll Cty. Comm'rs*, 476 F.3d 1277, 1282 (11th Cir. 2007). We see no reason why such a standard would fail to apply to foreign service of process. We thus join the majority of circuits to have considered the issue in holding that a plaintiff's complaint may be dismissed upon a showing that she failed to exercise diligence in attempting to effectuate service on a foreign defendant.

On appeal, Harris admits that she made no effort to serve the foreign defendants. Rather, she asserts that she misunderstood the service requirements. Having appealed the November Order, she claims she assumed that she would not

need to serve the non-OBS defendants until she received a decision from this Court concerning the viability of her claims vis-à-vis OBS.

We find no abuse of discretion in the district court's decision to dismiss Harris's claims against the foreign defendants for failing to exercise diligence in attempting service.  The fact that Harris may have erred in good faith does not immunize her claims from dismissal.  The district court operated well within its discretion in rejecting her explanation.   To avoid dismissal for lack of diligence, a plaintiff must demonstrate "at least as much as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice." *Lambert v. United States*, 44 F.3d 296, 299 (5th Cir. 1995) (quoting *Winters v. Teledyne Movible Offshore, Inc.*, 776 F.2d 1304, 1306 (5th Cir. 1985)) (emphasis omitted); *see also Lepone-Dempsey*, 476 F.3d at 1282 ("While the plaintiffs might have had good reason to think that they could rely on [the agent for service's] assertion that he would sign and return the waiver forms, the plaintiffs were responsible for formally serving the defendants when the waiver forms were not returned.").

Furthermore, Harris's alleged mistake does little to excuse her lack of diligence.  The only explanation she advances for her delay in serving the non-OBS defendants is that she was waiting for this Court to resolve her appeal from the November Order.  But nothing excuses her puzzling failure to make any

attempt to serve the non-OBS defendants prior to her receipt of the November

Order.  Harris filed her initial complaint in the Northern District of Georgia on

March 4, 2014; the district court issued a preliminary order dismissing her claims

against OBS on November 26, 2014.[7]  More than twice the number of days

allowed by Rule 4(m), 268 days, elapsed before the district court entered the

November Order.  During this time, Harris failed to serve a single one of the eight

non-OBS defendants.  Indeed, it does not appear from the record that she made any

attempt whatsoever to do so.  In the absence of any excuse for this failure, it was

well within the district court's discretion to determine that she failed to prosecute

her action.

## V. CONCLUSION

The district court did not err in dismissing Harris's federal and Georgia

RICO and GTSA claims for lack of standing, nor did it err in dismissing her

common law fraud claims for failure to state a claim.  Further, as to the non-OBS

defendants, the district court did not abuse its discretion in dismissing Harris's

claims for failure to effectuate service of process.

**AFFIRMED.**

---

[7] The order was later modified on November 28, 2014.

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

Amy C. Nerenberg
Acting Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

December 30, 2015

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  15-10553-BB
Case Style:  Marcia Harris v. Orange Business Services, U.S., et al
District Court Docket No:  1:14-cv-00641-TWT

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF")
system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal.
Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in
accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for
rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings,
a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time
specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a
motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list
of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-
1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition
for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming compensation for time
spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a
petition for a writ of certiorari (whichever is later).

Pursuant to Fed.R.App.P. 39, costs taxed against appellant.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature
block below. For all other questions, please call Carol R. Lewis, BB at (404) 335-6179.

Sincerely,

AMY C. NERENBERG, Acting Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs